MEMPHIS STEAM LAUNDRY-CLEANERS, INC., v. LINDSEY.

(In Banc. Dec. 20, 1941.)

[5 So. (2d) 227. No. 34736.]

C. R. **Bolton**, of Tupelo, and **Earl King**, of Memphis, Tennessee, for appellant.

228

Floyd W. Cunningham and Jas. A. Cunningham, both of Booneville, for appellee.

Argued orally by **C. R. Bolton**, for appellant, and by Floyd W. **Cunningham**, for appellee.

**McGehee, J.**, delivered the opinion of the court.

This is a suit under the common law for damages alleged to have been sustained by the appellee J. B. Lindsey, doing business as Lindsey's Cleaners, because of a campaign of unfair competition conducted by the officers and employees of the appellant corporation, Memphis Steam Laundry-Cleaners, Inc., for the expressed purpose of destroying the appellee's established business of cleaning and pressing men's suits and ladies' dresses within the territory hereinafter mentioned.

The case was submitted to the jury under instructions which permitted the assessment of punitive as well as actual damages, and with the result that a verdict was rendered in favor of the plaintiff Lindsey for the sum of $1,250. From this judgment, the defendant Memphis Steam Laundry-Cleaners, Inc., has prosecuted this appeal, and assigns as error (1) the refusal of the court below to grant a peremptory instruction in its favor on the ground that the plaintiff had failed either to establish liability or to prove that any actual damages were sustained by him; (2) the submission to the jury of the question of punitive damages; and (3) the overruling of objections to the admissibility of certain testimony. There was also a plea to the jurisdiction of the Circuit Court of Prentiss County on the ground that the defendant is a non-resident corporation domiciled at Memphis, Tennessee, with its resident agent for the service of process residing at

Tupelo, in Lee County, Mississippi, and that the cause of action did not occur or accrue in Prentiss County where the suit was brought. We think that a statement of the facts in the case will constitute a sufficient response to each of these assignments of error and demonstrate that neither of them are well taken, without the necessity of discussing them separately.

In the year 1939, the appellee Lindsey was engaged in the dry cleaning and pressing business in Booneville, Prentiss County, Mississippi, where his principal place of business was located, and also in the counties of Lee and Alcorn. His prices for cleaning and pressing men's suits and ladies' dresses were 35c in his home county of Prentiss, and 40c in the adjoining counties of Lee and Alcorn. The proof shows that he was making a legitimate profit at these prices, and his growing business afforded him the means of a livelihood for himself and family. At that time, the defendant was doing business in the City of Tupelo and elsewhere in Lee County, and in the counties of Itawamba, Monroe, Chickasaw, Union, Pontotoc, Prentiss (outside of Booneville), Panola, Tate and Coahoma. Its charges for cleaning and pressing suits and dresses up to the date of January 1940 were 50c in Itawamba, Monroe, Prentiss, Tate, Panola and Coahoma, but for this same service it was charging 85c in Lee and Union Counties, and 75c in Chickasaw County. On January 1, 1940, four other local cleaning and pressing establishments in the City of Tupelo who were charging 85c for this service reduced their prices to the approximately level of the price of 40c then being charged by the plaintiff. The defendant offered no testimony to the effect that the price of 40c was not sufficient to afford a legitimate profit, or that it was not a reasonable price for the customers to pay, nor was there any proof to show that the price of 85c charged by the defendant was reasonable. Following the reduction in prices on the part of these four other competitors in the City of Tupelo to the level of the prices being charged by Lindsey, the

district manager of the defendant at Tupelo went to the Town of Booneville in company with another employee of the defendant and called upon the plaintiff at his place of business, and told him that Tupelo was in the defendant's territory and that he could not continue to charge only 40c for the service, and further stated in substance that unless he would agree to compromise the matter by raising his prices to at least 75c that the defendant company intended to break him; that they had a couple of million dollars and would spend the last dollar of it to break him; and that "we are not up here to raise a racket but just come to tell you what you can do." Then, on January 22, 1940, the defendant reduced its prices in Tupelo to 20c for cleaning and pressing men's suits and 25c for ladies' dresses, and with the result that the gross receipts of the plaintiff's business in Tupelo for the first four months of the year 1940 were reduced to $1,083.90 as compared with $2,711.05 for the four preceding months, and it was shown that ordinarily there was very little change in the volume of the cleaning and pressing business during the first four months of the year as compared with the last four months of the preceding year.

During the course of the said conversation between the district manager of the defendant and the plaintiff at the latter's place of business in January 1940, the plaintiff informed the defendant's manager that he would not raise his prices, that crops in that section had been bad, and the people could not afford to pay the prices that the defendant wanted him to charge. Prior to that time, the defendant had not done business in the Town of Booneville, as heretofore stated, but on the following Monday its employees went to Booneville in trucks and began soliciting business at its reduced prices of 20c for cleaning and pressing men's suits and 25c for ladies' dresses, advertising such prices in the local newspaper and gave a local telephone number for customers to call for the service, and with the result that the plaintiff sustained a loss in gross receipts at Booneville of $427.10 during

the first nine months of the year 1940, as compared with the last nine months of the year 1939, and it was shown that ordinarily there was no material change in the volume of business during one of these periods as compared with the other.

From what is thus shown to have occurred at Booneville in Prentiss County on the occasion of the visit of the defendant's district manager to the office of the plaintiff, and also because of the acts performed at Booneville in furtherance of the plan of the defendant to injure the business of the plaintiff, we are of the opinion that the plea to the jurisdiction of the court was not well taken, the suit not having been brought under any anti-trust law so as to render it necessary that the same be filed in the county where the defendant has a domicile or place of business or its agent may be found, as provided for by Section 3445, Code of 1930.

Due to the fact that the plaintiff kept books to the extent only of showing the volume of the business done and of the collections made, without any record being made of his expenses, he was unable to show the amount of his profits either at Booneville or at Tupelo during any of the periods aforesaid so as to be able to definitely show the amount of the actual damages sustained; but since by reason of the conduct of the defendant heretofore referred to, when considered in the light of the facts hereinafter to be mentioned, a case was presented justifying an award of punitive damages, we need only be able to say from the entire record that the plaintiff sustained some actual damages, as a legal condition precedent to the allowance of punitive damages, and to then determine whether or not in view of the smallness of this verdict under the facts of the case the judgment should be disturbed. In the case of Robinson & Pattison v. Goings, 63 Miss. 500, the court held that punitive damages may be awarded for the unlawful seizure and detention of one's property, whereby he is prevented from the ordinary prosecution of his business, since such a wrong can-

not be said to work only a nominal injury, and wherein the court said: "The facts of this case warranted the jury in the infliction of punitive damages. Whether such damages may be awarded where there is only a nominal injury inflicted on the plaintiff it is not necessary to decide, since the evidence discloses a real injury, though uncertain in extent. One in the orderly and lawful prosecution of his business cannot be said to be only nominally injured by the unwarranted and illegal seizure and detention of his property by another, so as to interrupt the course of business of the owner."

The record in this case discloses that the district manager of the defendant, who undertook to coerce and intimidate the plaintiff at his place of business into raising his prices from 40c to at least 75c for a suit or dress, was present at the trial of this case and was in the witness room of the defendant at the time the other employee was testifying to contradict the plaintiff as to what occurred in the conversation, but the district manager did not take the witness stand. Moreover, it is further shown that in April of 1940, the plaintiff, in an effort to minimize the effects of the campaign being waged by the defendant to put him out of business, undertook to expand his operations, so as to secure a greater volume of business, and went into the Town of Ripley to obtain additional business at the same prices which he was charging elsewhere, and at which he thought he would be able to derive a legitimate profit. He was soon followed there by the defendant, with its published offer to render the service at one-half of what the plaintiff was charging; and with the result that Shannon Clayton, who had a son engaged in the cleaning and pressing business at Ripley, went to Memphis to interview a Mr. Rozier, president of the defendant corporation, for the purpose of impressing upon him what his course of action would do to the local cleaners of Ripley, and was told by Mr. Rozier that "all he could promise was that as soon as Lindsey stopped making Ripley he would move their Memphis prices back

to the local cleaners prices; that it would only be a few months before Lindsey would be bankrupt and that he hoped to have him on the W. P. A. in less than two years." Rozier also admitted to Clayton that 20c per suit was a "ridiculous" price but that it was only "temporary" and that it would lose his company "a tremendous amount of money but their business was so good in Memphis that the Memphis business would offset the losses in Mississippi"; and further stated that he had "a financial statement on Mr. Lindsey that had been very expensive to get, and from the appearance of Mr. Lindsey's equipment he could not last much longer," and made some further observation in regard to Lindsey being from the country and that he owned only a "little single-barrel equipment." As was to have been expected, the plaintiff Lindsey soon quit going to Ripley, with the result that Clayton made another trip to Memphis to get the defendant to carry out its promise to raise its prices back to the level of those charged by the local cleaners. Thereupon, he was directed to the official of the company who had taken Mr. Rozier's place with the corporation, and who informed him that "I don't think we are going to be able to do anything at all down there as Mr. Lindsey is still fighting and still on his feet"; that he did not feel obligated to carry out the promise made by Rozier, that Lindsey was still giving them trouble and had lasted longer than they had thought he would, and that it had cost them a good deal more money than they had figured on spending when they came into the territory and that it was their object to continue the fight until they put him out of business.

The foregoing testimony of Clayton is undisputed in the record. It was objected to on the ground that neither Rozier nor his successor as president of the company had the authority to bind the defendant in declaring what its motives were in the course of conduct complained of. In support of the objection to this testimony, the defendant contends that the prices had already been cut and

that these officers were merely discussing a past and completed occurrence, but we are of the opinion that this contention is unsound for the reason that the campaign to destroy the business of the plaintiff was still in progress, and they were announcing to Clayton a policy which they were then still pursuing on behalf of the defendant. In fact, the secretary-treasurer of the defendant company testified that "we generally all get together, everyone in the Memphis office, the vice president, president and probably the route supervisors would sit in if there is any change in prices in Memphis or any other price change." Hence the motives or malice of the officers of the defendant corporation while they were still engaged in carrying out their policy of trying to destroy the business of the plaintiff were the motives or malice of the corporation itself, since it could act only through them in determining upon and carrying out such a policy. 1 Jones on Evidence (4 Ed.), Sections 356, 357, p. 661; 22 C. J. Evidence, section 440; Yazoo & M. V. R. R. Co. v. Jones, 73 Miss. 229, 19 So. 91; and Mobile & O. R. R. Co. v. Stinson, 74 Miss. 453, 21 So. 14, 522. We think that the testimony of the witness Clayton was competent, as well as entirely relevant, and that the circumstances under which the statements were made to Clayton are such as to render inapplicable the cases of Western Union Tel. Co. v. Jackson, 95 Miss. 471, 49 So. 737; Deposit Guaranty Bank & Trust Co. v. Silver Saver Stores, 166 Miss. 882, 148 So. 367; Moore v. Chicago, St. L. & N. O. R. R. Co., 59 Miss. 243; Forsee v. Alabama Great So. R. R. Co., 63 Miss. 66, 56 Am. Rep. 801, and other cases relied upon by the appellant.

It is contended that the proof fails to show that either the executive officers or the district manager had any malice against the plaintiff personally, but it is said in 30 Am. Jur., section 39, p. 87, in reference to malice as a test of liability that "malice in its legal sense does not necessarily signify ill will toward a particular individual but denotes that condition of mind which is manifested by

the intentional doing of a wrongful act without just cause or excuse.'' This valuable text recognizes the fact that while ''many of the cases in which a recovery has been sought for a wrongful interference with one's trade or calling have been dismissed by reference to the general principle that 'an act lawful in itself is not converted by a malicious or bad motive into an unlawful act so as to make the doer of the act liable to a civil action' . . ., there is, however, abundant authority for saying that this is by no means the universal rule, at least as respects interference with a trade or calling, and that an act which is not of itself actionable may become so when done maliciously, wantonly, or without reasonable cause''; citing, among numerous cases, that of Globe & Rutgers Fire Ins. Co. v. Firemen's Fund Ins. Co., 97 Miss. 148, 52 So. 454, 455, 29 L. R. A. (N. S.) 869, as being among the ''abundant authority'' referred to. The reduction of prices is an act lawful in itself; it is an absolute right of the owner of a business. ''On the other hand, under the guise of exercising an absolute right, it is not lawful, according to some authorities, indirectly to interfere with the business, employment, or occupation of a third person, where the exercise of the right is with the object of injuring the latter rather than primarily of benefiting the person exercising such right.'' 30 Am. Jur., Sec. 39, p. 89. The objection to the appellant's position is that it sought to enlarge a legal right into a legal wrong; instead of enlarging or dignifying its privilege to cut prices for the purpose of promoting its own business, it degraded the same into a wilful wrong when employing it as a weapon for the ignoble purpose of inflicting upon the plaintiff a wanton injury.

The appellee charged a conspiracy among the officers and agents of the corporation to destroy his business, and the appellant contends that since they were acting on behalf of the corporation, the proof fails to sustain the conspiracy, since the corporation could not conspire with itself. ''A resort to the element of conspiracy to furnish

a basis for actions of this kind however, is wholly un-
necessary under the theory that a malicious interference
with a trade or calling is tortious per se." 30 Am. Jur.,
Section 40, p. 89. Either an individual or a corporation,
whether acting in conjunction with others, or not, may
be liable in such an action. In the case of Globe & Rutgers
Fire Ins. Co. v. Firemen's Fund Ins. Co., supra, where the
facts alleged in the declaration showed a determination
to destroy and drive the plaintiff out of business, the
court, in holding that it stated a good cause of action,
announced the principle that "surely no individual or
corporation may maliciously and wantonly set about to
ruin a competitor . . ." Again in Wesley v. Native
Lumber Company et al., 97 Miss. 814, 53 So. 346, 348,
Ann. Cas. 1912D, 796, the court said: "In Globe & Rut-
gers Fire Ins. Co. v. Firemen's Fund Fire Ins. Co., [97
Miss. 148], 52 So. 454 [455, 29 L. R. A. (N. S.) 869], this
court has set at rest in this state the question whether
an act, legal in itself, may become illegal, and a ground
of action, when accompanied with the malicious purpose
to injure the business of another, resulting in such injury
—holding the affirmative. . . . The act and the ac-
companying motive together constitute the unlawful act."

The case of Beardsley v. Kilmer, 236 N. Y. 80, 140 N. E.
203, 27 A. L. R. 1411, chiefly relied upon by the appellant,
cites the case of Wesley v. Native Lbr. Co., supra, along
with many other authorities, as denying the proposition
that it is lawful to perform an otherwise legal act, injur-
ing another, when there is no excuse for its performance
except the malicious purpose of injury. While it is true
that competition in business, though carried to the extent
of ruining a rival, is ordinarily not actionable, unless the
dominant purpose to inflict injury is established, we are
of the opinion that the jury was warranted in finding that
the purpose to injure or destroy the business of the plain-
tiff was dominant throughout the period complained of;
that the mere fact that the defendant intended at the end
of its ruthless campaign of trying to put the plaintiff out

of business to again raise its prices to their former level with the resultant advantage to itself, a policy wholly inimical to the public welfare, did not prevent its action from being primarily to do the plaintiff a wilful and wanton injury. The plaintiff had the right, under the law, as between himself and others, to exercise and enjoy the fruits and advantages of his own enterprise, industry and skill, and earn a livelihood by operating his business at a legitimate profit, free from any attempted dictation, coercion and intimidation on the part of the defendant, and from any threat of being driven into bankruptcy or being forced to seek employment on the W. P. A. unless he should agree to charge for his services a price at approximately double the figure at which he was already earning a legitimate profit.

But, it is argued that the plaintiff was the first to cut prices for the service and that therefore he is not in a position to complain. The record fails to disclose, however, that at the time the defendant reduced its prices below the cost of doing the work, the plaintiff had ever reduced or changed the prices being charged by him, and which was shown by the proof to be reasonable and legitimate. The record does show that the defendant instead of reducing its prices to meet legitimate competition, as did the local establishments, cut its own prices from 85c to 20c, or to one-half of that being charged by the plaintiff for the expressed purpose of injuring the plaintiff and destroying his means of earning a livelihood. Since its conduct was wilful and malicious within the legal meaning of the term and was engaged in primarily for the purpose of doing the plaintiff a wilful and wanton injury, there was neither error in refusing the peremptory instruction asked for nor in submitting to the jury the question as to punitive damages. If the case had been one entitling the plaintiff to actual damages only, it would be necessary that we hold that the data for the estimation of the loss of profits was not sufficiently definite and certain to have enabled the jury to ascertain the damages

with the reasonable certainty required, and it would be at least necessary that a new trial be ordered upon the sole issue of the amount of damages in order that such issue might be more fully developed, but in view of the fact that the case made was a proper one for the infliction of punitive damages, we have reached the conclusion that the judgment should not be disturbed. Although the proof as to the amount of the actual damages is unsatisfactory, it is sufficient to show that some actual damages necessarily resulted to the plaintiff from the defendant's wrongful act, sufficient to constitute a basis for an award of punitive damages in a sum much larger than the judgment rendered. We are therefore of the opinion that the case should be affirmed, notwithstanding that there was some testimony improperly admitted as to certain items of actual damages claimed, since, on the whole record, the plaintiff was entitled to recover and the amount of the verdict is extremely reasonable, if not inadequate, under the circumstances.

Affirmed.