811 So.2d 258 (2001)
Donald McCORKLE, Appellant,
v.
Mack H. McCORKLE, Appellee.
No. 1999-CA-01711-COA.
Court of Appeals of Mississippi.
January 9, 2001.
*260 Samuel Pearson Westmoreland, Hattiesburg, Attorney for Appellant.
T. Mack Brabham, McComb, Attorney for Appellee.
Before McMILLIN, C.J., LEE, and PAYNE, JJ.
LEE, J., for the Court:
¶ 1. This appeal is from the Circuit Court of Amite County where a jury returned a 12-0 verdict in favor of Mack McCorkle, the appellee and plaintiff below, awarding him $175,000 for invasion of privacy and intentional infliction of emotional distress, or outrageous conduct, against his son, Donald, appellant and defendant below. Donald's motion for JNOV, or in the alternative, a new trial, was denied, and he appealed, asserting six issues as the basis of error. Mack filed a cross-appeal asserting that the trial court erred in failing to submit the issue of punitive damages to *261 the jury and that attorney's fees should have been granted. After a thorough review of the record, we affirm as to the issues on direct appeal. As to the issues presented on cross-appeal, we reverse and remand on the issue of punitive damages, and reverse and render as to the issue of attorney fees.

FACTS AND RELEVANT PROCEDURE
¶ 2. This case arises from a family dispute. The event which triggered the series of judicial proceedings culminating in this appeal was Mack's harvesting of timber in 1994 on a portion of a 215 acre tract of land. The record indicates that Mack held a life estate in this land and his children the remainder. Mack testified that he harvested fifty acres of the tract for a certain amount of cash. Because the agreement was culminated on a handshake there is no written contract regarding the particulars.
¶ 3. It was Donald's contention that the timber company with whom his father dealt took advantage of him, compensating him for only one third or one half of the true value of the timber. Donald then pursued a vendetta against the timber company by trying to show that his father was mentally incompetent to contract. The next five years saw an inundation of pleadings marked by excessive satellite litigation. We begin with a chronology of the events necessary to an understanding of the issues submitted on this appeal.
¶ 4. Shortly after Mack sold the timber, Donald filed an application for Mack's commitment in the Chancery Court of Amite County on August 23, 1994, and made the first of four attempts to have Mack picked up by the Veterans Administration. Donald affirmed in the application for commitment that Mack was mentally ill and posed a substantial likelihood of physical harm to himself or to others because of a recent attempt or threat to physically harm himself or others. Donald wrote, as justification on the application that Mack was a threat, that: three years ago Mack's wife died and he said he was going to kill the doctors who treated her; that Mack had a falling out with his son eight-teen months ago, and Mack was throwing money away, had cut timber, and bought a Cadillac; that seven to eight months ago Mack had shot his dogs; that Mack had used profane language toward his other sons; and that Mack had a mental illness since 1960 and received a VA check for his mental disability. One week after Donald filed the application for commitment, two medical doctors examined Mack and declared him to be mentally competent. The doctors documented on the certificate of examination that no disease was found and that Mack appeared normal to them. Donald's motion for commitment was dismissed by the chancery court through the special master who had been appointed.
¶ 5. The same day that Mack was declared mentally competent he filed suit to remove cloud to title to his land. On March 25, 1995, judgment was entered for Mack for title to the land and on that same day Donald again requested that the VA pick up Mack as mentally incompetent and made the first of three requests for Mack's confidential VA claims file ("c-file").
¶ 6. Because many of the issues in this case are centered around the c-file, we will describe the nature of this file, as explained by Sam Jarvis, Chief of the Veterans Service Center, before proceeding further. As the chief administrating officer, Jarvis is in charge of the adjudication of all claims for VA benefits. He is also in charge of the fiduciary unit, which oversees incompetent veterans. In this capacity he is in control of the c-files for veterans who file claims for disability benefits. *262 Jarvis testified that a veteran's c-file contains all of the information necessary to support a veteran's receipt of benefits requested. It includes medical, educational and service records. The c-file is confidential and requires written authorization from the veteran for its release. Jarvis said that information regarding psychiatric evaluation is particularly sensitive and that special care is taken to assure that it is properly released. Jarvis further testified that he was not aware that Mack's signature was forged when the c-file was sent to Mack's physician, Dr. Piker. He did acknowledge that Mack's signature authorizing the release did not appear to match other VA documents in the file bearing Mack's signature. The only information regarding Mack's psychiatric condition that was entered into evidence from his c-file was that Mack had a neuropsychiatric condition at the 100 percent rate for more than twenty years. Specifically, Jarvis explained that this meant because Mack received this evaluation in 1971, his benefits were protected at this particular evaluation and could not be reduced. In other words, Mack's disability benefits were vested. Jarvis said that Mack was protected by his right to privacy from any further information being disclosed from his c-file.
¶ 7. In May 1995, Donald mailed a letter to his sister, Ruth, warning her that if he found out that she had anything to do with Mack's sale of the timber that he would do everything he could by law to deal misery to her as long as he lived. He stated in the letter that he had the time and the money to make life for her a living hell. In August, Donald again attempted to have the VA pick up Mack, and the VA informed him that this would require a showing of medical evidence that Mack was incapable of managing his own affairs. Donald admitted to having gone to Dr. Piker, Mack's physician, and asking him to request the c-file from the VA. In October, Donald again requested the c-file from the VA, and Dr. Piker sent a form to the VA requesting Mack's medical records. There is conflicting testimony regarding Mack's signature on that form. Mack said that Piker tricked him into signing the form, whereas Donald said the signature was not Mack's but was authorized by him. Mack, however, testified that he never intended to authorize the release of the c-file. Dr. Piker then mailed a letter to the VA requesting Mack's c-file with Mack's signature, or its likeness, authorizing its release. The letter stated that the information in the file would be helpful to him in providing medical care to Mack. Once Piker requested the c-file, Donald checked with him periodically for its receipt. Two months after Piker received the c-file Piker received a request for a production of documents for the c-file from an attorney who was representing the estate of Donald's deceased brother. Donald admitted to asking the attorney to request the production of the documents from Dr. Piker. It is undisputed that Donald thus acquired the c-file through the attorney and sent portions of it to nineteen people or organizations, including CNN, ABC, CBS, NBC, and Congressman Richard Baker of Louisiana.
¶ 8. Donald subsequently filed another lawsuit against the timber company and a verdict was returned in favor of the timber company.[1] In September 1997, Donald filed a second application for commitment against Mack. Several witnesses testified on behalf of Mack and the special master *263 entered an order dismissing the application, concluding that the evidence failed to prove that Mack was mentally ill. The next day Donald was recorded in a telephone conversation with his sister, Ruth. In the conversation he said that he did not intend to drop his vendetta with the timber company because he had already invested seventy thousand dollars and three years of his time. In the conversation he said that he would get two million dollars out of his pursuit. Ruth asked Donald if he would "run over his daddy to get it", and he responded that he would. This recording was played at the trial.
¶ 9. In March 1998, Mack filed his complaint against Donald for invasion of privacy and outrageous conduct. The jury returned a verdict unanimously in favor of Mack, giving rise to this appeal.

ISSUES
¶ 10. Donald asserts six issues in his appeal which are discussed below.

I. DOES THE THREE YEAR STATUTE OF LIMITATIONS AS PROVIDED IN MISS. CODE ANN. § 15-1-49 RATHER THAN THE ONE YEAR STATUTE AS PROVIDED IN MISS. CODE ANN. § 15-1-35 APPLY TO INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS OR OUTRAGEOUS CONDUCT?
¶ 11. As a preliminary matter, Macks's claim for outrageous conduct is, under Mississippi law, more commonly known as the intentional infliction of emotional distress. Donald v. Amoco Production Co., 735 So.2d 161, 179 (¶ 61) (Miss. 1999). We will not, therefore, consider the outrageous conduct claim as a separate claim, thus there is one claim for the intentional infliction of emotional distress. Donald argues that Mack's claim for intentional infliction of emotional distress falls within the one year statute of limitations rather than the three year statute espoused in Miss.Code Ann. § 15-1-49 (Rev. 1995). The one year statute states:
All actions for assault, assault and battery, maiming, false imprisonment, malicious arrest, or menace, and all actions for slanderous words concerning the person or title, for failure to employ, and for libels, shall be commenced within one (1) year next after the cause of such action accrued, and not after.
Miss.Code Ann. § 15-1-35 (Rev.1995). He relies on City of Mound Bayou v. Johnson, 562 So.2d 1212 (Miss.1990), which held that the above stated statute extends to all actions substantially like the eight enumerated and for which no other specific statute has been provided. Id. at 1218. That case held that false arrest fell within the one year statute. Id. Though the Mississippi Supreme Court has not expressly stated that the one year statute applies to intentional infliction of emotional distress, the issue has been discussed in King v. Otasco, Inc., 861 F.2d 438, 442 (5th Cir. 1988), which is cited in City of Mound Bayou, 562 So.2d at 1218. King states that because the claims for intentional infliction of emotional distress and outrageous conduct, although not explicitly listed in the one year statute, are intentional torts, and so closely analogous to the common law actions for assault, libel, and slanderous words that they too must fall within the statute's bar. King, 861 F.2d at 442.
¶ 12. Though this cause of action may be subject to the one year statute, it is not necessary that we so hold in order to determine if Mack's cause of action was timely filed. The continuing tort doctrine and facts of this case clearly indicate that Mack filed his claim in a timely fashion. The trial court was correct in its evaluation of the case as one where the evidence disclosed a continuing course of conduct with the most recent incident *264 being Donald's second application for Mack's commitment. A continuing tort involves a repeated injury and the cause of action begins to run from the date of the last injury, tolling the statute of limitations. Smith v. Franklin Custodian Funds, Inc., 726 So.2d 144(¶ 17) (Miss. 1998). Donald's wrongful conduct began in August 1994, with the first commitment proceeding, and continued until September 1997, with the culmination of the second commitment proceeding. Mack's complaint was filed just seven months after Donald's second application for Mack's commitment was filed, which tolled the statute and was clearly within its one year limit. Though the first commitment hearing and its related subsequent events prior to the second commitment hearing occurred outside the limitations period, the violation is closely related to the violations occurring within the limitations period and recovery is permitted on the theory that all violations are part of one continuing act. Stevens v. Lake, 615 So.2d 1177, 1183 (Miss.1993); Smith v. Sneed, 638 So.2d 1252, 1255-56 (Miss. 1994). Under this theory, evidence of the first commitment filed by Donald in August 1994, and the subsequent sequence of events following, through the second commitment hearing, were properly before the court.

II. DOES THE THREE YEAR STATUTE OF LIMITATIONS AS PROVIDED IN MISS. CODE ANN. § 15-1-49 RATHER THAN THE ONE YEAR STATUTE IN MISS. CODE ANN. § 15-1-35 APPLY TO INVASION OF PRIVACY?
¶ 13. A review of Mississippi case law as well as that of the relevant federal district courts regarding the appropriate statute of limitations for the tort of invasion of privacy bears ambiguous results, at best. The tort of invasion of privacy is not expressly included in section 15-1-35 of the Mississippi Code, but Southern Land & Resources Co. v. Dobbs, 467 So.2d 652, 654 (Miss.1985), held that this tort may be included as a tort of a type enumerated in the statute. The United States Fifth Circuit Court of Appeals in Guthrie v. J.C. Penney Co., 803 F.2d 202, 211 (5th Cir. 1986), stated that a tort which is not expressly included in the statute but is of a similar type may be covered by the one year statute of limitation instead of the catch-all provision. However, a later case, Mize v. Harvey Shapiro Enterprises, Inc., 714 F.Supp. 220, 224 (N.D.Miss.1989), stated that it was uncertain if the one-year statute applied to invasion of privacy. Confining our search to the more recent cases is helpful. The Mississippi Supreme Court in Young v. Jackson, 572 So.2d 378, 382 (Miss.1990), stated that the one-year statute applied to such actions, citing City of Mound Bayou, 562 So.2d at 1218, and Andrews v. GAB Business Services, Inc., 443 F.Supp. 510, 513 (N.D.Miss.1977). A later case, Blackwell v. Hustler Magazine, Inc., 633 F.Supp. 870, 871 (S.D.Miss.1986) overruled Andrews and held that the one-year statute did not apply. Nichols v. Tri-State Brick and Tile Company, Incorporated, 608 So.2d 324, 332 (Miss.1992), though not specifically referring to the tort of invasion of privacy, stated that the one year statute in Miss.Code Ann. § 15-1-35 (Rev.1995) was not intended to cover all intentional torts. Nichols went on to say that where the conduct alleged may be categorized as one of the torts enumerated in the statute, the statute would be applicable. Id. Most recently, Disney v. Horton, No. CIV.A.2:99-CV-0138 at 7 (N. D.Miss. Apr. 14, 2000), stated that invasion of privacy was subject to the one year statute and cited Young as precedent, overlooking the fact that Young relied on Andrews which was overruled by Blackwell. Young and Disney, both Mississippi *265 Supreme Court cases, indicate that invasion of privacy is subject to the one-year statute.

When was the one year statute in Miss.Code Ann. § 15-1-35 tolled?
¶ 14. Donald asserts that in Mississippi the cause of action for invasion of privacy begins to run from the time of the injury and not from the time that the injury was discovered, citing McCarlie v. Atkinson, 77 Miss. 594, 599, 27 So. 641, 642 (1990). That case states that an action for libel incurred by publication of a letter is complete upon the receipt of the letter and not upon discovery of its publication. The court in McCarlie held that though the mailing of a letter to another state may constitute a cause of action for libel, the actual sending of the letter by mail did not constitute fraudulent concealment of its contents so as to effect the tolling of the statute of limitations. We do not find this aspect of the case relevant to the facts in the case sub judice.
¶ 15. Though this is not a case regarding libel, the settings for causes of action as in the law of defamation and in an invasion of privacy context have been considered analogous. Young, 572 So.2d at 382. Generally, an action for libel or defamation accrues at the time of the first publication for public consumption. Forman v. Mississippi Publishers Corp., 195 Miss. 90, 107, 14 So.2d 344, 347 (1943). The court in Staheli v. Smith, 548 So.2d 1299 (Miss.1989), recognized an exception to this general rule. Staheli was a professor at the University of Mississippi who filed suit against a dean of the school for alleged defamatory material which had been placed in his tenure file. Id. at 1300-01. The dean claimed that Staheli was barred by Miss.Code. Ann. § 15-1-35, citing the general rule that the statute began to run from the date of publication of the allegedly libelous statement to a third person. Id. at 1302. Staheli argued that the statute should not begin to run until he reasonably, by due diligence, was able to discover that he had been defamed. Id. The Mississippi Supreme Court held that the general policies underlying the statute of limitations would not be thwarted by adoption of the discovery rule in libel cases where, because of the secretive or inherently undiscoverable nature of the publication the plaintiff did not know, or with reasonable diligence could not have discovered, that he had been defamed. Id. at 1303. The court stated that in such instances a plaintiff could not be accused of sleeping on his rights. Id. This exception was most recently recognized in Ellisville State School v. Merrill, 732 So.2d 198, 200-01 (¶ 15-16) (Miss.1999).
¶ 16. We believe the discovery rule is applicable to the facts in this case. Donald first requested the c-file from the VA in 1995 and continued his secret efforts to acquire the file until 1996. Dr. Piker received the c-file in February 1996. In April 1996, Dr. Piker received a request for the production of documents through the surreptitious use of an estate proceeding for Donald's deceased brother. Donald's last publication of the c-file was in December 1996, when he forwarded a copy of it to the Mississippi Bar Association as part of a bar complaint. There was never any contention made at the trial that Mack knew that these events were taking place. The record clearly indicates that it was at the second commitment hearing in September 1997, that Ruth Benson, Mack's daughter, realized that Donald had Mack's VA file. Though Sam Jarvis was not certain as to how the VA actually became aware of the commitment proceedings, he indicated that in October 1997, a call was received by the VA from the Inspector General's office informing it that there *266 were problems regarding Mack's case. At that time the VA sent a letter to Donald asking him several questions, among them, if he had a copy of the c-file and if he released information from the file to anyone else. The VA received Donald's response on October 29, 1997, which indicated that Donald had received the c-file through Dr. Piker and that Donald sent the file to nineteen people and news agencies. On November 25, 1997, Mack's attorney met with Sam Jarvis to review Mack's file. It was at that time that it was realized that Donald had sent copies of Mack's c-file to various people and news agencies.
¶ 17. On November 25, 1997, after discovering Donald's surreptitious activities, Mack filed his complaint on March 26, 1998. The statute of limitations was tolled by Donald's conduct and the claim is thus not barred.

III. IS THE CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS OR OUTRAGEOUS CONDUCT BARRED BY JUDICIAL PRIVILEGE?
¶ 18. Donald cites Gunter v. Reeves, 198 Miss. 31, 38, 21 So.2d 468, 470 (1945), as support of his claim that because assertions and allegations published as part of judicial proceedings are privileged, that his comments and assertions in regard to the commitment proceeding are privileged. Statements made in connection with judicial proceedings, including pleadings, are, if in any way relevant to the subject matter of the action, absolutely privileged and immune from attack as defamation, even if such statements are made maliciously and with knowledge of their falsehood. Id. at 470. Hardtner v. Salloum, 148 Miss. 346, 114 So. 621, 623-24 (1927). This, however, is not a case for defamation and stops short in his reliance on Gunter, for Gunter goes on to say that such statements may support a claim for malicious prosecution. Gunter, 198 Miss. at 39, 21 So.2d at 471. There is precedent indicating that the presence of malice prohibits the assertion of judicial privilege. Hyde Const. Co., Inc. v. Koehring Co., 387 F.Supp. 702, 725-26 (S.D.Miss.1974).[2] Affidavits regarding prior judicial proceedings were admissible as evidence from which the jury could infer malice in Pulliam v. Ott, 246 Miss. 739, 748, 150 So.2d 143, 147 (1963). Because we find there is evidence in the record to support a finding of malice in the case at bar, which is discussed in the cross-appeal elsewhere in this opinion, we do not find that Donald may assert judicial privilege and find no merit to this assignment of error.

IV. WAS THE TRIAL COURT IN ERROR IN GRANTING INSTRUCTION P 5 CHARGING THE JURY THAT DONALD HAD NO RIGHT, AS A MATTER OF LAW, TO POSSESS OR DISCLOSE MACK'S MEDICAL RECORDS?
¶ 19. Jury instruction P-5 is lengthy, however, the relevant portion reads:
There is a second grounds for invasion of privacy for which Mack McCorkle can recover which is for Donald McCorkle publicly disclosing facts which were private as to Mack H. McCorkle. In order to establish this claim, Mack McCorkle must show that the matter publicized was of a kind that would be highly offensive to a reasonable person and is not of a legitimate concern to the public. Concerning this specific claim, the court instructs *267 you that the medical records of Mack McCorkle are confidential by the laws of the State of Mississippi. The court further instructs you that the claims file of Mack H. McCorkle from the Veterans Administration is considered to be private and non-disclosable by federal statute. The court further instructs you that Donald McCorkle had no right as a matter of law to possess or disclose the medical records or the claims file from the Veteran's Administration without the specific consent of Mack H. McCorkle.
Donald contends that this instruction is, in essence, a charge for a directed verdict. His argument revolves around whether he disclosed private or public information. He asserts that the instruction is in error because there are instances where one may legally possess the medical records of others without consent, such as when the information is no longer private as the result of a previous publication or in such instances where the disclosure is in the best interest of the public. Donald cites Plaxico v. Michael, 735 So.2d 1036 (Miss. 1999), as authority. Plaxico regards a modification of child custody and stands for the proposition that a non-custodial parent can invade the privacy of a third person to show that the custodial parent had an intimate relationship with that person. Plaxico, 735 So.2d at 1038 (¶ 10). We find Plaxico irrelevant.
¶ 20. Donald was given three jury instructions on his defense to the invasion of privacy claim, instructions D-5, D-6, and D-7. Instruction D-7 specifically stated that the law did not recognize a right to privacy in connection with that which is already public. Jury instructions are to be read as a whole. Splain v. Hines, 609 So.2d 1234, 1239 (Miss.1992). A review of the jury instructions shows that the instructions correctly stated the law, that being that Mr. Mack's c-file from the VA was private and that Donald had no right to possess or disclose those records unless the information had become public.
¶ 21. We actually find that the court went the extra mile in an effort to allow Donald a defense on invasion of privacy. Jury instructions must be supported by credible evidence. Id. Donald testified that in 1988 his mother gave him the documents he mailed all over the country and he identified those documents as Exhibit 9. The record shows that Donald's mother died in 1991. Several documents in Exhibit 9 were generated after 1995. In addition, VA records show that Donald wrote to the VA, in response to its inquiry, and that he received the c-file from Dr. Piker. We fail to find that there was any credible evidence to support Donald's claim that Mack had published his c-file.
¶ 22. We find no error with jury instruction P-5. It is a correct statement of the law and is consistent with Candebat v. Flanagan, 487 So.2d 207, 209 (Miss.1986).

V. WAS THE TRIAL COURT CORRECT IN EXCLUDING PROPOSED TESTIMONY OF AN ALLEGED HISTORY OF PEDOPHILIA?
¶ 23. In this assignment of error Donald claims that he should have been allowed to present, as a defense to Mack's action for intentional infliction of emotional distress against him, evidence that Mack was a pedophile and a continuing threat to young children. The avowed purpose of this testimony was to show that Donald had a proper motivation for committing Mack. In considering the admissibility of the pedophilia evidence, the court determined that it would not be admitted after it had thoroughly reviewed the c-file Donald had tendered to the court. We note that the c-file was not made a part of this record. The court acknowledged that though Mack's c-file indicated that Mack *268 had exhibited abnormal behavior in his childhood, that Donald's claims were too remote to be admissible, relying upon Miss.Code Ann. § 41-21-61(e)(Rev.1993). In the context of the facts in this case, that section, regarding persons in need of mental treatment, defines a mentally ill person as follows:
"Mentally ill person" means any person who has a substantial psychiatric disorder of thought, mood, perception, orientation, or memory which grossly impairs judgment, behavior, capacity to recognize reality, or to reason or understand, which (i) is manifested by instances of grossly disturbed behavior or faulty perceptions; and (ii) poses a substantial likelihood of physical harm to himself or others as demonstrated by (A) a recent attempt or threat to physically harm himself or others ...
Miss.Code Ann. § 41-21-61(e)(Rev.1993). Donald claims that he should have been permitted to offer a cousin as a witness who would have testified that Mack had molested her as a child. The court, in its decision to exclude the evidence, relied on the statute's limitation which required that the behavior manifesting a substantial likelihood of harm to others be demonstrated by a "recent attempt" to harm others. The court found that none of the evidence of Mack's alleged pedophilia or "abnormal behavior" fell within this category of time. In addition, the court noted that even if the evidence had been of some probative value, that value was outweighed by its prejudicial effect, thereby violating M.R.E. 403. General Motors Acceptance Corp. v. Baymon, 732 So.2d 262, 271 (¶ 43) (Miss. 1999).
¶ 24. We note that there is no evidence in this extensive record indicating that Mack had in the past been charged or convicted of pedophilia. Surveying the evidence presented at the trial regarding this issue, it appears that the only proffer of evidence indicating pedophilia is that of Donald himself. The record is clear that Donald was thoroughly impeached at trial on several occasions. Notably, Donald was forced to admit on cross-examination that the opinion of the chancery judge in Mack's suit to remove cloud on title after the first commitment hearing stated repeatedly that he found Donald's testimony incredible and that it was literally inconsistent with the testimony of all of the other witnesses. It was bought out at the trial that the chancery judge also stated that Donald's attitude was one of superiority over his father and the other family members and that Donald showed no interest in his father's welfare. In addition, the exhibits containing the documents supporting both commitment hearings do not indicate allegations that Donald sought to commit Mack because of a sexual deviancy or pedophilia. We thus find that there is no error in the exclusion of this evidence.

VI. WERE THE ELEMENTS FOR INVASION OF PRIVACY ESTABLISHED?
¶ 25. The recognition of the tort for invasion of privacy was explicitly recognized in Mississippi in Deaton v. Delta Democrat Publishing Co., 326 So.2d 471, 473 (Miss.1976). As recognized in Deaton, the four theories underlying the cause of action are as follows: 1) the intentional intrusion upon the solitude or seclusion of another; 2) the appropriation of another's identity for an unpermitted use; 3) the public disclosure of private facts; and 4) holding another to the public eye in a false light. Id. It is thus not one tort but a complex of four. Id; Candebat v. Flanagan, 487 So.2d 207, 209 (Miss.1986). The tort of invasion of privacy is comprised of four distinct and separate sub-torts. Plaxico, 735 So.2d at 1039. In the case at bar, it is the third of the sub-torts which is at *269 issue, the public disclosure of private facts. The court in Candebat stated that a claim based on this sub-tort requires that the publicity be of a kind that would be "highly offensive to a reasonable person". Candebat, 487 So.2d at 211.
¶ 26. Donald states that the court erred in not granting his motion for JNOV because Mack failed to establish the elements necessary to support his claim for invasion of privacy. The motion for JNOV tests the legal sufficiency of the evidence supporting the verdict. Tait v. State, 669 So.2d 85, 88 (Miss.1996). It asks the Court to hold, as a matter of law, that the verdict may not stand. Where a motion for JNOV has been made, the trial court must consider all of the evidence not just evidence which supports the nonmovant's casein the light most favorable to the party opposed to the motion. Hall v. Mississippi Chem. Express, Inc., 528 So.2d 796, 798 (Miss.1988). The non-movant must also be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. Id. If the facts and inferences so considered point so overwhelmingly in favor of the movant that reasonable men could not have arrived at a contrary verdict, granting the motion is required. On the other hand, if there is substantial evidence opposed to the motion, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied and the jury's verdict allowed to stand. General Tire and Rubber Co. v. Darnell, 221 So.2d 104, 105 (Miss.1969); Paymaster Oil Mill Co. v. Mitchell, 319 So.2d 652, 657 (Miss. 1975); City of Jackson v. Locklar, 431 So.2d 475, 478 (Miss.1983); Jesco v. Whitehead, Inc., 451 So.2d 706, 714 (Miss.1984).
¶ 27. We are thus bound to review the evidence in the light most favorable to Mack, the non-moving party, who maintains that the evidence was sufficient to support the verdict. Looking at the evidence presented at the trial, we find that there is an abundance of evidence supporting that Mack had not published the c-file. Mack himself denied that he ever published the information and stated that he never intended to authorize the release of the file. The record does not support Donald's assertions in his brief that Mack admitted that he had given many of his friends and relatives copies of the VA records in question. On the contrary, Mack stated that his wife had stored some VA records, along with birth and marriage certificates in a fireproof box. Mack did not state what the nature of these VA papers were and said nothing to indicate they were even part of his claims file.
¶ 28. We thus find that there is substantial evidence to support Mack's claim that he had not published his c-file to support his claim for invasion of privacy. Donald's motion for JNOV was properly denied. General Tire and Rubber Co., 221 So.2d at 105.

THE CROSS-APPEAL

WAS THE TRIAL COURT IN ERROR IN REFUSING TO SUBMIT THE ISSUE OF PUNITIVE DAMAGES TO THE JURY?
¶ 29. Regarding punitive damages, Mississippi provides the following statute:
(1) In any action in which punitive damages are sought: (a) Punitive damages may not be awarded if the claimant does not prove by clear and convincing evidence that the defendant against whom punitive damages are sought acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud. *270 Miss.Code Ann. § 11-1-65(1)(a)(Supp.2000). For punitive damages to be awarded, the injuries must have "some element of aggression or some coloring of insult, malice, or gross negligence, evincing ruthless disregard for the rights of others, so as to take the case out of the ordinary rule." Finkelberg v. Luckett, 608 So.2d 1214, 1220 (Miss.1992). That is, the plaintiff is entitled to recover punitive damages "only if he has demonstrated a willful or malicious wrong or the gross, reckless disregard for the rights of others." Boling v. A-1 Detective & Patrol Serv. Inc., 659 So.2d 586, 588 (Miss.1995). That a finding of malice will give rise to an assessment of punitive damages has been reiterated in Aetna Casualty & Surety Co. v. Day, 487 So.2d 830, 833 (Miss.1986) and Weems v. American Security Insurance Co., 486 So.2d 1222, 1226 (Miss.1986). Mack relies on this statute and cites Ciba-Geigy Corporation v. Murphree, 653 So.2d 857 (Miss.1994), as authority that the issue of punitive damages should have been submitted to the jury. Ciba-Geigy states that it is the duty of the trial court to listen to all admissible evidence and determine whether or not under the totality of circumstances, viewing the defendant's conduct in the aggregate, a reasonable, hypothetical trier of fact could either find malice or reckless disregard. Id. at 863; Colonial Mortg. Co., Inc. v. Lee, 525 So.2d 804, 808 (Miss.1988).
¶ 30. Malice, in its legal sense, means a wrongful act done intentionally, without just cause or excuse. Memphis Steam Laundry-Cleaners v. Lindsey, 192 Miss. 224, 237-38, 5 So.2d 227, 231 (1941). Malice in law is not necessarily personal hate or ill will, but it is that state of mind which is reckless of law and of the legal rights of the citizen. BLACK'S LAW DICTIONARY 862 (5th ed.1979). Malice is usually shown by circumstantial evidence and may be inferred from the fact that a defendant may have acted with reckless disregard for a plaintiff's rights. Strong v. Nicholson, 580 So.2d 1288, 1293 (Miss.1991). For example, the Strong court found malice where the defendants freely conceded that their lone purpose was to "get their stuff back" and that they really did not care what happened to plaintiffs. Id. Courts have found malice where criminal proceedings have been instituted for the purpose of debt collection, finding a reckless disregard of rights. Rhodes v. Roberts, 223 Miss. 580, 586, 78 So.2d 614 (1955); Grenada Coca Cola Co. v. Davis, 168 Miss. 826, 833, 151 So. 743 (1934).
¶ 31. Looking at the record in the case sub judice, the trial judge, in ruling not to allow the issue of punitive damages to be submitted to the jury, concluded that the evidence showed that Donald did not disseminate his father's records out of a malicious intent to injure him, but out of a vendetta toward what he perceived to be improper business activity against the timber company. The court recognized, however, that there was some evidence to the contrary. Without conceding that Donald's vendetta may have been against the timber company as opposed to his father, we do not find, under the statute, Ciba-Geigy, and other precedent, that this vendetta gives Donald the right to recklessly disregard his father's right to privacy nor does it justify the outrageous conduct demonstrated in Donald's having subjected Mack to commitment proceedings to further his own interests. Donald also made four requests to the VA to commit Mack and requested that the VA appoint him as fiduciary over Mack's affairs. As a fiduciary, Donald would have been entitled to Mack's monthly disability benefits. In addition, the record shows that Donald blatantly disregarded the law. Donald testified that when Sam Jarvis informed him that his actions regarding the c-file were illegal, he responded, "Arrest me, I need the publicity." This was corroborated by *271 Sam Jarvis. We do not deny that Donald may have had a viable claim against the timber company of some sort. Nevertheless, that should have been asserted against the timber company and does not absolve him of the responsibility for his actions toward his father. This state's supreme court has pointed out that the award of punitive damages is in the nature of a punishment for wrongdoing and an example, so that others may be deterred from the commission of such wrongs and the public be properly protected. Yazoo & M.V.R. Company v. May, 104 Miss. 422, 61 So. 449, 450 (1913). It is undisputed that Donald's institution of proceedings against Mack were for purposes wholly inconsistent with their lawful function. Donald's ulterior purpose was to gain lawful advantage beyond the lawful scope of the proceedings. We find that the facts of this case support a finding of malice and reckless disregard for Mack's rights by clear and convincing evidence, the standard to which we are bound by statute, consistent with Strong and Rhodes. A jury instruction for punitive damages therefore should have been granted. The trier of fact should be instructed that the primary purpose of punitive damages is to punish the wrongdoer and deter similar misconduct in the future by the defendant and others while the purpose of compensatory damages is to make the plaintiff whole. Miss.Code Ann. § 11-1-65(1)(e) (Supp.2000); Fred's Stores of Mississippi, Inc. v. M & H Drugs, Inc., 725 So.2d 902, 918 (Miss.1998).
¶ 32. We do not find the authority cited on this issue by Donald, Blue Cross & Blue Shield of Mississippi v. Campbell, 466 So.2d 833 (Miss.1984), persuasive. We find that case to be particularly relevant to punitive damages in cases involving issues concerning the bad faith denial of insurance claims. Id. at 842. By holding that the question of punitive damages should have been submitted to the jury, we intimate no view that any such damages should or should not be assessed in this case. The award of punitive damages is within the discretion of the jury. Allen v. Ritter, 235 So.2d 253, 256 (Miss.1970); Royal Oil Co., Inc. v. Wells, 500 So.2d 439, 450 (Miss.1986).

CONCLUSION
¶ 33. For these reasons aforementioned we affirm as to the issues on direct appeal and reverse and remand as to the issue regarding punitive damages on the cross-appeal. In response to the issue on cross-appeal requesting attorney fees, the rule in the absence of statute is that they are not recoverable unless the facts are of such gross or willful wrong as to justify the infliction of punitive damages. Netterville v. Mississippi State Bar, 404 So.2d 1026, 1028 (Miss.1981). Because we are of the opinion that the trial court was in error in denying that the issue of punitive damages be submitted to the jury, it follows that an award of attorney fees would have been proper.
¶ 34. THE JUDGMENT OF THE AMITE COUNTY CIRCUIT COURT AS TO THE ISSUES ON APPEAL IS AFFIRMED; REVERSED AND REMANDED AS TO PUNITIVE DAMAGES ON CROSS-APPEAL; REVERSED AND RENDERED AS TO ATTORNEY FEES ON CROSS-APPEAL. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
McMILLIN, C.J., KING and SOUTHWICK, P.JJ., BRIDGES, IRVING, MYERS, PAYNE and THOMAS, JJ., concur.
CHANDLER, J., not participating.
NOTES
[1] This case was appealed to this Court as McCorkle and McCorkle v. Loumiss Timber Co., 760 So.2d 845 (Miss.Ct.App.2000).
[2] Although this case is flagged as having been overruled by Dunn v. Koehring Co., 546 F.2d 1193 (5th Cir.1977), and the decision was clarified on rehearing at 551 F.2d 73 (5th Cir.1977), the issues addressed were not in regard to the issue of malice as cited here.