2010 UT 23

**Kipp CABANESS, an individual, and Does 1–20, Plaintiffs and Appellants,**

v.

**Brent THOMAS, an individual; Clifford C. Michaelis, an individual; Bountiful City, a Municipal Corporation; Bountiful City Power; and Does 1–100, Defendants and Appellees.**

No. 20080446.

Supreme Court of Utah.

April 23, 2010.

488

Craig L. Taylor, Harold H. Armstrong, Willis F. McComas, Kaysville, for plaintiffs.

Stanley J. Preston, Maralyn M. Reger, Bryan M. Scott, Salt Lake City, for defendants Brent Thomas and Clifford C. Michaelis.

Russell L. Mahan, Bountiful, for defendants Bountiful City and Bountiful City Power.

## AMENDED OPINION *

PARRISH, Justice:

### INTRODUCTION

¶ 1 Kipp Cabaness brought intentional infliction of emotional distress claims against Brent Thomas and Clifford C. Michaelis for allegedly engaging in a pattern of harassment, intimidation, and abuse at his workplace. Additionally, Cabaness brought breach of contract and wrongful termination claims against Bountiful Light & Power ("Bountiful Power"). The district court granted summary judgment in favor of Thomas, Michaelis, and Bountiful Power (collectively "Defendants") on each of Cabaness' claims. Cabaness subsequently filed a motion under Utah Rules of Civil Procedure 59 and 60(a) to amend or alter judgment. The district court denied the motion.

¶ 2 Cabaness appeals the district court's summary judgment ruling in favor of Defendants, denial of his cross motion for partial summary judgment, and denial of his motion under Utah Rules of Civil Procedure 59 and 60(b). We affirm in part and reverse in part.

### BACKGROUND

¶ 3 "On appeal from a summary judgment we accept the facts and inferences in the light most favorable to the losing party." *Franco v. Church of Jesus Christ of Latter-day Saints*, 2001 UT 25, ¶ 32, 21 P.3d 198 (internal quotation marks omitted). We

therefore state the facts in the light most favorable to Cabaness.

¶ 4 Kipp Cabaness was employed by Bountiful Power from March 1978 to January 2004. From time to time, Cabaness was given a copy of the Personnel Policies & Procedures Manual of the City of Bountiful (the "Employee Manual" or "Manual"). The Employee Manual states that it is "specifically intended to apply to regular employees." Defendants do not dispute that Cabaness was a "regular employee" as that term is defined within the Employee Manual. The Employee Manual contains a disclaimer stating that "[n]o contract exists between Bountiful City and its employees with respect to salary, salary ranges, movement within salary ranges, or employee benefits." Section 406 of the Manual, entitled "Work Environment", states that "City policy will not tolerate verbal or physical conduct by any employee which harasses, disrupts, or interferes with another's work performance or which creates an intimidating, offensive, or hostile environment. . . ." Section 408, entitled "Work Place Violence", mandates that "[o]ral or written threats, physical assault, harassment, intentional damage, and every other act or threat of violence by City employees is strictly prohibited." Section 409, entitled Sexual and Other Harassment, provides as follows:

> Any behavior or conduct of a harassing or discriminating nature . . . which is pervasive, unwelcome, demeaning, ridiculing, derisive or coercive, or results in a hostile, abusive or intimidating work environment constitutes harassment and shall not be tolerated by the City.
>
> . . .
>
> No City official or employee shall harass, coerce, intimidate, threaten or discipline employees who exercise their rights under this procedure in good faith.

¶ 5 From 1984 to 2004, Cabaness was a line working foreman at Bountiful Power under the immediate supervision of Brent Thomas, the superintendent of operations. The director of Bountiful Power and Thomas' direct supervisor was Clifford Michaelis.

---

* Changes were made in paragraphs 2, 17, 23, 47, 71 and 76. Also in footnotes 3, 7, and 9.

While Michaelis had authority to hire and fire employees, Thomas did not.

¶ 6 Numerous employees at Bountiful Power testified that Thomas frequently used gross profanity and consistently verbally harassed, intimidated, and ridiculed the employees he supervised. To his subordinates, Thomas was known as "Little Hitler" or "Dr. Jekyl and Mr. Hyde," and the walkway to his office was known as the "green mile," a name from a movie depicting the pathway to the electric chair in a prison.

¶ 7 Thomas frequently made the work of his subordinates harder without providing any justification for doing so other than to assert his authority over them. For example, in the late 1990s, Cabaness' crew and another crew were pulling in underground wire at a high school. Cabaness and the other foreman had positioned the trucks and other equipment to begin pulling the wire when Thomas arrived and ordered that the trucks and other equipment be repositioned. When Cabaness and the other foreman questioned why, Thomas responded that he was the boss, and if they did not do what he said, he would write them up for insubordination, and they might be fired. Similarly, in 2000 or 2001, Cabaness and his crew were building a transmission line and had just finished framing a pole. As the crew went to set it into the ground, Thomas arrived and ordered them to disassemble the pole and to frame another identical pole to set in its place. Again, when Thomas was asked why, he gave no explanation other than that was what he wanted to happen.

¶ 8 Thomas' conduct also evinced a disregard for safety procedures in an occupation that relies on such procedures to protect its employees. Around 1983 or 1984, Thomas refused to let Cabaness put a ground on a pole with a primary line of 7200 volts before working on it in order to save time. On another occasion, Thomas ignored for several months Cabaness' concerns regarding blown fuses on a power line near an elementary school that Cabaness felt were potentially hazardous for children. Although emergencies sometimes required Bountiful Power employees to work in the rain, Thomas would order crews to work in the rain even when the work could have been postponed and completed more safely in drier conditions. Thomas dismissed the employees' concerns by telling them that he had bought them rain gear and they should use it. As safety director, Cabaness held monthly safety meetings, but Thomas routinely cut the meetings short.

¶ 9 In July 2003, Thomas ordered Brent Tuttle, a member of Cabaness' crew, to remove concrete from around a conduit of live, primary electrical distributors using a jackhammer. Tuttle testified that he told Thomas this was unsafe and that he could be killed if the jackhammer broke through and touched the live line, but Thomas ordered him to do it anyway. Fearing for his job, and based on past intimidation from Thomas, Tuttle jackhammered the concrete. The operation was fortunately shut down before anyone was actually injured. Cabaness was not present during this incident and did not become aware of it until he returned to work more than a month after the incident occurred. After the incident took place, the Bountiful Power Safety Committee investigated and, among other things, recommended that Thomas be given a Serious Safety Violation citation.[1]

¶ 10 On a regular basis, Thomas would tell Cabaness that he was "lucky to have this job" and that if he did not do what he was told he could be fired even though Thomas lacked the authority to do so. Indeed, many employees at Bountiful Power testified that Thomas regularly threatened to fire them. On one occasion, Thomas walked up to a new employee and told him he was fired and only later told the employee he was not serious.

¶ 11 Throughout Cabaness' career with Bountiful Power, Thomas would insult and demean him by, among other things, calling him "dumbass," "jackass," and "asshole," and using cutting sarcasm. Thomas would occa-

---

1. Defendants argue that we should not consider evidence from the Bountiful Power Safety Committee's report because it constitutes inadmissible hearsay. We disagree inasmuch as the factual findings of the committee fall under the Public Records and Reports exception to the hearsay rule. *See* Utah R. Evid. 803(8).

sionally tell Cabaness that he had a "piss poor attitude." On one occasion, Thomas told Cabaness, "You know what your problem is? It's your wife. You need to get rid of your wife." Thomas pursued this subject until Cabaness finally responded "my wife is none of your business and my relationship with my wife is none of your business, so drop it." On another occasion, Cabaness witnessed Thomas knee an employee in the groin with enough force to cause the employee to fall to the floor in pain, after which Thomas stated, "I guess I showed you who is boss."

¶ 12 In August 1997, Cabaness was first diagnosed with depression related to "unusual stress in his work environment from his supervisor." In June 2003, Cabaness met with Dr. VandeMerwe who also diagnosed him with major depression and chronic dysthymia with insomnia. Dr. VandeMerwe testified that Cabaness' work environment and abusive boss were a "substantial factor" in his diagnosis of depression. Cabaness was off work from July 23 to September 8, 2003, due to medically-diagnosed depression attributable in significant part to "a hostile work environment and an abusive boss." Thomas and Michaelis were both aware that Cabaness was off work for depression-related problems. Yet, when Cabaness returned to work in September 2003, Thomas singled him out in an employee meeting, threatened to fire him, and criticized him about personal issues in front of other employees.

¶ 13 Numerous employees, including Cabaness, complained to Michaelis on various occasions regarding Thomas' abusive, harassing, and intimidating conduct. In 1997, Cabaness and two other foremen complained to Michaelis about Thomas. In response, Michaelis warned them that any further complaints regarding Thomas' conduct may result in their termination.[2] Finally, in September 2003, after Thomas' involvement in the jackhammer incident, Michaelis formed a committee to investigate complaints of harassment and intimidation by Thomas. The committee interviewed fifteen Bountiful

Power employees. As a result of the investigation, Michaelis sent a letter to Thomas warning him that his "intimidation need[ed] to stop," and that if he was unwilling to make a "lifetime change" he would be forced into retirement.

¶ 14 Cabaness quit working for Bountiful Power in January of 2004. Between the summer of 2003 and the spring of 2004, all but two of the Bountiful Power employees on Thomas' crew quit, primarily due to Thomas' abusive conduct.

¶ 15 Based on the above facts, Cabaness brought intentional infliction of emotional distress claims against Thomas and Michaelis, a breach of contract claim against Bountiful Power for failure to enforce provisions of the Employee Manual, and a wrongful termination claim against Bountiful Power.

¶ 16 The district court entered summary judgment in favor of Bountiful Power, Thomas, and Michaelis holding that as a matter of law (1) Cabaness failed to demonstrate that Thomas' and Michaelis' conduct was extreme, intolerable, and outrageous and therefore Cabaness could not prove intentional infliction of emotional distress; (2) the Employee Manual did not create a contract between Bountiful Power and Cabaness; and (3) Cabaness failed to allege any violation of a clear and substantial public policy and therefore could not succeed on his wrongful termination claim. After the district court entered its order granting summary judgment, Cabaness filed a rule 59 and 60(b) motion pursuant to the Utah Rules of Civil Procedure to alter or amend the district court's final order based on purported new law and newly discovered evidence. In conjunction with the rule 59 and 60(b) motion, Cabaness filed affidavits from Bountiful City employees Kenneth Mears and Bonnie Quinn (the "city employee affidavits") that addressed the City's intent regarding the binding nature of the Manual. The district court found that the affidavits were untimely and denied the motion.

¶ 17 Cabaness appealed the district court's grant of Defendants' motion for summary

---

**2.** Michaelis disputes that this is the message he intended to convey to Cabaness and the other two foremen. He does not, however, dispute that it is possible that they may have come away from the conversation with that understanding.

judgment, denial of his cross motion for partial summary judgment, and denial of his rule 59 and 60(b) motion. We have jurisdiction under Utah Code section 78A–3–102(3)(j) (2008).

## STANDARD OF REVIEW

¶ 18 Summary judgment is appropriate only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c). "Because we resolve only legal issues in reviewing a summary judgment, we give no deference to the [district] court's view of the law; we review it for correctness." *Franco v. Church of Jesus Christ of Latter-day Saints*, 2001 UT 25, ¶ 32, 21 P.3d 198 (internal quotation marks omitted). "In reviewing a grant of summary judgment, we determine only whether the [district] court erred in applying the governing law and whether the [district] court correctly held that there were no disputed issues of material fact." *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395, 400 (Utah 1998) (internal quotation marks omitted).

## ANALYSIS

¶ 19 We begin by addressing Defendants' preliminary argument that we should strike Cabaness' appellate brief and assume the correctness of the district court's decision. We conclude that Cabaness' appellate brief should not be stricken and then proceed to consider Cabaness' (1) intentional infliction of emotional distress claim, (2) implied contract claim, and (3) wrongful constructive termination claim.

## I. BECAUSE CABANESS' APPELLATE BRIEF IS ADEQUATE, WE DECLINE TO ASSUME THE CORRECTNESS OF THE JUDGMENT BELOW

¶ 20 Defendants argue that we should disregard Cabaness' appellate briefs and assume the correctness of the judgment below pursuant to Utah Rule of Appellate Procedure 24 and the court of appeals' analysis in *Koulis v. Standard Oil Co.*, 746 P.2d 1182 (Utah Ct.App.1987). Rule 24 provides,

in relevant part, that "[a]ll statements of fact and references to the proceedings below shall be supported by citations to the record," and the argument section must contain relevant "citations to the authorities, statutes, and parts of the record relied on." Utah R.App. P. 24(a)(7), (9). In *Koulis*, the court of appeals relied on rule 24 when it sua sponte disregarded the brief of a party where the brief was "filled with burdensome, emotional, immaterial and inaccurate arguments," and "only a small proportion of authorities cited . . . [bore] any resemblance to the propositions for which they [were] cited." 746 P.2d at 1185. It is true that "this court need not, and will not consider any facts not properly cited to, or supported by, the record," *Carrier v. Salt Lake County*, 2004 UT 98, ¶ 21, 104 P.3d 1208 (internal quotation marks omitted). Moreover we may "assume the correctness of the judgment below" when a party fails to provide a proper statement of facts supported by accurate citations to the record. *Koulis*, 746 P.2d at 1185 (citing *Fackrell v. Fackrell*, 740 P.2d 1318, 1319 (Utah 1987)). In this case, however, Cabaness' brief does not rise to that level.

¶ 21 In *Carrier*, we declined to strike a party's brief where the "brief as a whole [was] supported by the record, and the [party made] good faith arguments that [were] adequately supported by case law." 2004 UT 98, ¶ 19, 104 P.3d 1208. Similarly, although the facts and arguments in Cabaness' brief are, at times, tainted with his emotional bias, when considered as a whole, his statement of facts is supported by the record and he presents good faith legal arguments that are adequately supported by case law. Further, Cabaness' brief is replete with citations to the record that allow us to determine the accuracy and relevance of the statements it contains. Therefore, we decline Defendants' invitation to strike Cabaness' brief.

## II. WE AFFIRM IN PART AND REVERSE IN PART THE DISTRICT COURT'S GRANT OF SUMMARY JUDGMENT AGAINST CABANESS ON HIS CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

¶ 22 Cabaness argues that the district court erred in granting Defendants' motion

for summary judgment on his intentional infliction of emotional distress claims against Thomas and Michaelis. The district court held that Thomas' and Michaelis' conduct was not outrageous and intolerable, and therefore, Cabaness' claim for intentional infliction of emotional distress failed as a matter of law. Before reaching the merits of the district court's decision, we first address the parties' preliminary arguments regarding what evidence Cabaness may rely on to demonstrate intentional infliction of emotional distress. Specifically, Defendants argue that Cabaness may not rely on (1) any conduct that occurred outside the applicable statute of limitations period, (2) any conduct that occurred outside of Cabaness' presence, and (3) any evidence contained in the affidavit of Steve Knighton, another foreman for Bountiful Power.[3] After addressing these preliminary evidentiary issues, we turn to the merits of the district court's denial of Cabaness' intentional infliction of emotional distress claims.

A. The Applicable Statute of Limitations Does Not Preclude Cabaness From Relying on the Defendants' Entire Course of Conduct

■ ¶ 23 Defendants do not argue that Cabaness failed to assert his intentional infliction of emotional distress claim before the statute of limitations had run. Rather, they argue that Cabaness may only seek redress for Defendants' actions committed between the four-year period of March 31, 2000 to March 31, 2004, the latter being the date on which Cabaness filed his Complaint. Under Defendants' theory, each distinct act that allegedly inflicted emotional distress constituted a separate tort that started the running of a separate four-year statute of limitations. Therefore, under Defendants' theory, any evidence of conduct that occurred prior to March 31, 2000, is inadmissible to demonstrate intentional infliction of emotional dis-

tress. Cabaness, on the other hand, argues that the intentional infliction of emotional distress constituted a continuous and ongoing tort, and therefore, he may offer evidence of the entire pattern of mistreatment and abuse in attempting to prove his claim. We agree with Cabaness.

■ ¶ 24 Claims for intentional infliction of emotional distress are subject to a four-year statute of limitations. See Utah Code Ann. § 78-12-25(3) (2002).[4] "Under Utah law, the statute of limitations begins to run when the cause of action accrues." *Retherford v. AT & T Commc'ns,* 844 P.2d 949, 975 (Utah 1992). A claim of intentional infliction of emotional distress usually accrues when a plaintiff suffers extreme emotional distress. However, as we noted in *Retherford,* there are occasions when "emotional distress does not so much occur as unfold— for example, where a defendant subjects a plaintiff, not to a single outrageous act, but to a pattern or practice of acts tolerable by themselves though clearly intolerable in the aggregate." *Id.* Faced with this dilemma, we held in *Retherford* that "the statute of limitations for intentional infliction of emotional distress does not begin to run until the distress is actually inflicted, i.e., when the plaintiff suffers severe emotional disturbance." *Id.* However, we noted that "[a]lthough easy to describe, this standard is difficult to apply, particularly because the element of emotional distress is specific to the plaintiff in each case." *Id.*

¶ 25 In *Hatch v. Davis,* 2004 UT App 378, 102 P.3d 774, the court of appeals struggled to apply the standard set forth in *Retherford* to a similar set of facts. Unable to determine when the emotional distress was actually inflicted, the court of appeals held that "when conduct that would give rise to a claim of intentional infliction of emotional distress is continuous and ongoing, and it is unclear

---

3. Defendants also argue that we should not consider evidence set forth in the Report and Affidavit of Dr. Hawks (collectively the "Hawks report"). It is unclear from the record whether the district court in fact struck the Hawks report. However, because our holding today is the same whether or not we consider the evidence contained in the Hawks' report, we need not address

defendants' arguments regarding its admissibility.

4. This statute has been re-codified at Utah Code Ann. § 78B-2-307 (2008). However the substance remains the same as the 2002 version in effect at the time this case was heard.

when the plaintiff suffered severe emotional distress, the statute of limitations begins to run from the time the last injury is suffered or the tortious conduct ceases." *Hatch,* 2004 UT App 378, ¶ 44, 102 P.3d 774. Like the court of appeals, we find the standard set forth in *Retherford* to be burdensome and generally unhelpful when confronted with allegations of a pattern of continuous and ongoing conduct resulting in intentional infliction of emotional distress.[5]

■■■ ¶ 26 However, while the standard set forth by the court of appeals in *Hatch* is an improvement from the *Retherford* rule, it is unduly constrained by the qualifier that it applies only in cases where there is uncertainty as to the moment a plaintiff suffered severe emotional distress. Therefore, like many other jurisdictions, we now hold that when a claim of intentional infliction of emotional distress is alleged based on a pattern of continuous and ongoing tortious conduct, the statute of limitations begins to run at the time the last injury occurred or the tortious conduct ceases. *See, e.g., Curtis v. Firth,* 123 Idaho 598, 850 P.2d 749, 755 (1993) (noting that the "concept of continuing tort ... should be extended to apply in other limited contexts, including particularly intentional infliction of emotional distress"); *Feltmeier v. Feltmeier,* 207 Ill.2d 263, 278 Ill.Dec. 228, 798 N.E.2d 75, 89 (2003) (stating that a claim of intentional infliction of emotional distress is a "continuing tort," and therefore, "a plaintiff's cause of action accrues, and the statute of limitations begins to run, at the time the last injurious act occurs or the conduct is abated"); *McCorkle v. McCorkle,* 811 So.2d 258, 264 (Miss.Ct.App.2001) (explaining that a claim for intentional infliction of emotional distress was a continuing tort, and therefore,

the statute of limitations began to run from the date of the last injury).

■■■ ¶ 27 We further hold that a plaintiff alleging an intentional infliction of emotional distress claim based on a defendant's ongoing and continuous conduct may recover for the entire course of defendant's conduct.[6] Other jurisdictions are in accord with such an approach. *See, e.g., Feltmeier,* 278 Ill.Dec. 228, 798 N.E.2d at 85–89 (holding that a spouse's conduct throughout an eleven-year marriage could be considered an intentional infliction of emotional distress claim because the claim was a continuing tort); *McCorkle,* 811 So.2d at 264 (noting that "recovery [on acts outside the limitations period] is permitted on the theory that all violations are part of one continuing act"); *GTE Sw., Inc. v. Bruce,* 998 S.W.2d 605, 615 (Tex.1999) ("When ... repeated or ongoing harassment is alleged, the offensive conduct is evaluated as a whole." (citations omitted)).

■■■ ¶ 28 In this case, the district court failed to make any determination regarding when the statute of limitations began to run on Cabaness' intentional infliction of emotional distress claim. Under our clarification of the rule today, the limitations period on Cabaness' claim began to run on January 2, 2004, the date on which Cabaness resigned from Bountiful Power, and his exposure to Defendants' conduct ceased. Cabaness brought this action in March 2004 and is therefore not barred by the statute of limitations. Further, because Cabaness alleges a pattern of continuous and ongoing maltreatment, he is not limited to showing Defendants' tortious conduct within a four-year period. Rather, he may support his claim with evidence of Defendants' entire course of conduct.

---

5. The rule in *Retherford* functioned well in that case because (1) it was relatively easy to determine when emotional distress was inflicted and (2) the moment that plaintiff suffered severe emotional distress directly corresponded to the complete abatement of the defendants' tortious conduct.

6. This recovery rule we announce today is specific to a claim for intentional infliction of emotional distress that arises from a defendant's continuous tortious conduct. The ability to recover for the entire course of a defendant's conduct may

not apply in other types of continuing torts, such as a continuing trespass or continuing nuisance. *See, e.g., Breiggar Properties, L.C., v. H.E. Davis & Sons, Inc.,* 2002 UT 53, ¶ 11, 52 P.3d 1133 (limiting recovery for a continuing trespass to the three years proceeding the date the cause of action was filed); *see also Huffman v. United States Postal Service,* 82 F.3d 703, 705 (6th Cir.1996)(limiting recovery for a continuing nuisance claim to the "limitations period immediately preceding the initiation of the action.").

## B. Cabaness Cannot Avail Himself of the Exception to the "Presence" Requirement

¶ 29 Defendants argue, and the district court agreed, that Cabaness could not rely on Defendants' conduct that occurred outside his presence. Specifically, Defendants argue that Cabaness may not rely on the jackhammer incident to demonstrate intentional infliction of emotional distress.

¶ 30 "[C]onduct which occurs outside the presence of a plaintiff may not contribute to a claim of intentional infliction of emotional distress except under particularly compelling circumstances." *Hatch v. Davis,* 2006 UT 44, ¶ 26, 147 P.3d 383.

> In considering whether conduct triggers the exception [to the "presence" rule], a finder of fact may consider (1) the relationship of the target of the conduct to the plaintiff, (2) the relationship between the person committing the conduct and the plaintiff, and (3) the egregiousness of the conduct. Finally, (4) a plaintiff must establish that the conduct was undertaken, in whole or in part, with the intention of inflicting injury to the absent plaintiff.

*Id.* ¶ 27. Applying these factors, the district court found that the jackhammer incident was inadmissible for purposes of demonstrating extreme and outrageous conduct because Cabaness failed to demonstrate that Thomas' conduct was intended "in whole or part" to injure Cabaness. We agree. At the time the jackhammer incident took place, Cabaness was on medical leave for depression. Cabaness did not find out about the jackhammer incident until a few weeks after the incident occurred, at which time he alleged that he broke down in tears. While the jackhammer incident may have caused Cabaness to suffer emotional distress, there is no direct evidence that Thomas intended his conduct to inflict injury on Cabaness. We therefore hold that the district court did not err in excluding evidence of the jackhammer incident to prove Cabaness' claim of intentional infliction of emotional distress.[7]

7. We note, however, that there is nothing that prevents Cabaness from offering evidence of the jackhammer incident, or other conduct that oc-

## C. Evidence of Defendants' Conduct Contained in the Knighton Affidavit Is Admissible

¶ 31 Cabaness argues that the district court erred when it determined that the "majority of the allegations made by Mr. Knighton [in his affidavit] are conclusory" and therefore inadmissible. A district court's refusal to consider evidence or to exclude evidence is reviewed under an abuse of discretion standard. *Daines v. Vincent,* 2008 UT 51, ¶ 21, 190 P.3d 1269 ("With regard to our review of the exclusion of evidence, we grant a trial court broad discretion to admit or exclude evidence and will disturb its ruling only for abuse of discretion.").

¶ 32 The district court found that the "majority of the allegations made by Mr. Knighton are conclusory and insufficient to support a finding that Mr. Thomas engaged in the requisite extreme and outrageous conduct necessary to constitute a claim for intentional infliction of emotional distress." Although we agree that by itself Mr. Knighton's affidavit does not suffice to prove intentional infliction of emotional distress, we disagree that all of the evidence therein is inadmissible.

¶ 33 "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Utah R. Civ. P. 56(e). Affidavits reflecting an affiant's unsubstantiated conclusions and opinions are inadmissible. *See Murdock v. Springville Mun. Corp.,* 1999 UT 39, ¶ 26, 982 P.2d 65.

¶ 34 While some of Mr. Knighton's statements are conclusory, most are based on personal knowledge and set forth admissible facts. Specifically, in relevant part, Mr. Knighton's affidavit asserts that on the day after Cabaness returned to work from a six to seven week leave of absence for work-related depression, Mr. Knighton was present in a meeting where Thomas criticized Cabaness about personal matters. Additionally, Mr. Knighton claims Mr. Thomas said,

curred outside Cabaness' presence, in connection with his breach of contract claim discussed in Part III of this opinion.

in the presence of the other employees, that he was considering firing Cabaness. These assertions are purely factual and nonconclusory, and therefore admissible. The district court abused its discretion by failing to consider these assertions as evidence of Thomas' conduct.

### D. The District Court Erred in Finding That Thomas' Conduct Did Not Rise to the Level of Outrageous and Intolerable but It Correctly Found That Michaelis' Conduct Could Not Constitute Intentional Infliction of Emotional Distress

¶ 35 Cabaness argues that the district court erred when it determined as a matter of law that Thomas' and Michaelis' conduct was not outrageous and intolerable, and was therefore insufficient to support a claim of intentional infliction of emotional distress. Rather, Cabaness argues that the district court should have determined that Thomas' and Michaelis' conduct met the necessary threshold to allow the claim to proceed to a jury. In other words, that reasonable persons could differ regarding whether the conduct was extreme, outrageous, and intolerable. We agree that the facts do not support an intentional infliction of emotional distress claim against Michaelis. But we hold that reasonable minds could differ regarding whether Thomas' conduct was outrageous and intolerable, and therefore the district court erred by failing to allow Cabaness' claim against Thomas to proceed to a jury.

¶ 36 To succeed on a claim of intentional infliction of emotional distress, a plaintiff must demonstrate that the defendant

intentionally engaged in some conduct toward the plaintiff, (a) with the purpose of inflicting emotional distress, or, (b) where any reasonable person would have known that such would result; *and* his actions are of such a nature as to be considered outrageous and intolerable in that they offend against the generally accepted standards of decency and morality.

*Bennett v. Jones, Waldo, Holbrook & McDonough*, 2003 UT 9, ¶ 58, 70 P.3d 17 (emphasis in original) (quoting *Franco v. Church of Jesus Christ of Latter-day Saints*, 2001

UT 25, ¶ 25, 21 P.3d 198). Further, " '[i]t is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery.' " *Gygi v. Storch*, 28 Utah 2d 399, 503 P.2d 449, 450 (1972) (quoting Restatement (Second) of Torts § 46 cmt. h (1965)). However, "[w]here reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability." *Id.*

¶ 37 Defendants argue that Cabaness' claim against Michaelis fails as a matter of law because he cannot demonstrate that Michaelis' conduct was directed toward Cabaness with the intent to inflict emotional distress. Rather, Defendants argue that Michaelis merely failed to curb Thomas' conduct. Cabaness fails to provide any case law supporting the position that the failure to prevent another from inflicting emotional anguish gives rise to a valid claim of intentional infliction of emotional distress. Further, we do not find any support within our jurisprudence for such a position. We do not deny that there may be persuasive case law in other jurisdictions for extending the reach of intentional infliction of emotional distress to include situations where an individual fails to prevent another from engaging in conduct that inflicts emotional distress on a third person, particularly where, as here, the individual appears to have some duty or obligation to prevent the outrageous conduct. However, "we support the rigorous scrutiny applied to attempts to expand the reach of intentional infliction of emotional distress," *Hatch v. Davis*, 2006 UT 44, ¶ 32, 147 P.3d 383. Cabaness has simply failed to persuade us that we should expand the rule at this time. We therefore affirm the district court and hold that Cabaness' intentional infliction of emotional distress claim against Michaelis fails as a matter of law.

¶ 38 We now consider whether the district court erred in determining that Thomas' conduct was not sufficiently outrageous and intolerable, such that Cabaness could not demonstrate intentional infliction of

emotional distress. "To be considered outrageous, the conduct must evoke outrage or revulsion; it must be more than unreasonable, unkind, or unfair." *Franco*, 2001 UT 25, ¶ 28, 21 P.3d 198, (internal citations and quotation marks omitted). Additionally, we have stated that " 'liability [for intentional infliction of emotional distress] clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities.' " *Bennett*, 2003 UT 9, ¶ 64, 70 P.3d 17 (alteration in original) (quoting Restatement (Second) of Torts § 46 cmt. d (1965)). However, in *Retherford v. AT & T Communications*, we recognized that while a single insult, indignity, or threat may not give rise to liability for intentional infliction of emotional distress, a continuous and ongoing pattern of the same may constitute extreme, intolerable, and outrageous conduct and thus result in liability. 844 P.2d 949, 975–76, 978 (Utah 1992).

¶ 39 In *Retherford*, the plaintiff alleged intentional infliction of emotional distress based on an ongoing pattern of intimidation and harassment. *Id.* at 975. Specifically, the plaintiff alleged that after she filed a sexual harassment complaint, her co-workers began to harass and intimidate her, and continued to do so for a number of months. *Id.* at 978. In holding that the plaintiff met the required threshold showing of outrageous and intolerable conduct, we noted that the plaintiff had alleged "more than simple insult or annoyance." *Id.* Rather, she alleged "months of persecution by her co-workers" where they "shadowed her movements, intimidated her with threatening looks and remarks, and manipulated circumstances at her work in ways that made her job markedly more stressful, all in retaliation for her good-faith complaint of sexual harassment." *Id.*

¶ 40 Here, as in *Retherford*, Cabaness has alleged an ongoing and continuous pattern of abusive, intimidating, and harassing behavior from his supervisor, Thomas. Throughout Cabaness' career, Thomas insulted and demeaned him by, among other things, calling him "dumbass," "jackass," and "ass hole." Thomas often told Cabaness he had a "piss poor attitude." Indeed, many employees testified that Thomas frequently used gross profanity and consistently verbally harassed the employees, including Cabaness. On one occasion, Thomas told Cabaness that his problem was his wife, and that he needed to get rid of his wife. Various employees testified that Cabaness was often the focus of Thomas' abusive behavior, especially towards the end of his employment with Bountiful Power. Cabaness and other employees frequently complained to Michaelis about Thomas' conduct. As in *Retherford*, Cabaness and other employees testified that Thomas' behavior worsened after they complained to Michaelis about his conduct.

¶ 41 Cabaness also provided evidence demonstrating that Thomas intentionally made Cabaness' job more difficult and stressful. For example, on various occasions Thomas would arrive at a work site and mandate that Cabaness and other employees stop what they were doing and do things the way he wanted without providing any justification other than his superiority. Similarly, Cabaness testified that Thomas frequently told him that he was lucky to have his job and that he could be fired if he did not do what he was told.

¶ 42 In an occupation that relies on safety procedures to secure the safety of its employees, Cabaness offered evidence demonstrating Thomas' disregard for the safety of Cabaness and other employees. Early in Cabaness' career, Thomas refused to put a ground on a pole with a primary line of 7200 volts before requiring Cabaness to work on it. As safety director, Cabaness held monthly safety meetings that Thomas routinely cut short. Further, Cabaness testified that Thomas frequently required him, and other employees, to perform electrical work in the rain even though the work could have been postponed and completed more safely.

¶ 43 In 1997 Cabaness was first diagnosed with depression related to "unusual stress in his work environment from his immediate supervisor." Later, in 2003, Cabaness met with another doctor who also diagnosed him with major depression related, in part, to "a hostile work environment and an abusive boss." Due to his depression, Cabaness did not work for approximately six weeks in 2003. Michaelis testified that Thomas would

have been aware that Cabaness was absent due to depression-related problems. Yet, on the day after Cabaness returned to work, Thomas singled him out in an employee meeting, threatened to fire him, and criticized him about personal matters in front of other employees.

¶ 44 In late 2003, Michaelis finally formed a committee to investigate the complaints regarding Thomas' harassment and intimidation. After interviewing fifteen employees, Michaelis sent a letter to Thomas warning him that his "intimidation needs to stop." When the situation failed to improve, Cabaness resigned in January 2004. Significantly, between summer 2003 and spring 2004, all but two of the Bountiful Power employees assigned to Thomas' crew quit primarily due to his harassing, abusive, and intimidating conduct.

¶ 45 While any of these alleged insults or indignities on their own may not rise to the level of outrageous and intolerable conduct, taken together, and viewed in a light most favorable to Cabaness, we conclude that reasonable minds could differ regarding whether Thomas' conduct was outrageous and intolerable. Accordingly, we hold that the district court erred when it found as a matter of law that Thomas' conduct was not outrageous, intolerable and offensive to generally accepted standards of decency and morality. Rather, because the facts, as alleged, raise genuine and material issues regarding the level of outrageous and intolerable conduct, summary judgment was inappropriate.

¶ 46 We now turn to whether the Employee Manual created an implied contract between Cabaness and Bountiful Power.

III. THE EMPLOYEE MANUAL CREATES A CONTRACT BETWEEN CABANESS AND BOUNTIFUL POWER AS A MATTER OF LAW

¶ 47 Cabaness argues that the district court erred in denying his motion for partial summary judgment and by holding as a matter of law that the Employee Manual did not give rise to an implied contract. In conjunction with these claims of error, Cabaness argues that the district court erred in deny-

ing his rule 59(a) and 60(b) motion and determining that the city employee affidavits were inadmissible. Additionally, Cabaness argues that the district court erred by finding in the alternative that Cabaness' implied contract claim was barred by governmental immunity. We begin by determining whether the district court erred in not admitting the city employee affidavits and then turn to the merits of Cabaness' implied contract claim.

*A. The District Court Did Not Abuse Its Discretion by Denying Cabaness' Rule 59(a) and 60(b) Motion and Striking the City Employee Affidavits*

¶ 48 Cabaness argues that the district court erred in striking the city employee affidavits and that we should therefore consider the affidavits in our determination of the implied contract issue before us. We decline to do so.

¶ 49 After the district court entered summary judgment, Cabaness filed a rule 59(a) and 60(b) motion to alter or amend the order of summary judgment. The motion was accompanied by the city employee affidavits. The city employee affidavits address Bountiful Power's alleged intent that the Employee Manual constitute a contract between Bountiful Power and its employees. The district court found that the city employee affidavits failed to satisfy the newly discovered evidence standards of rule 59(a) and rule 60(b) and were therefore inadmissible.

¶ 50 We review a district court's decision to strike affidavits under an abuse of discretion standard. *Daines v. Vincent*, 2008 UT 51, ¶ 21, 190 P.3d 1269 ("With regard to our review of the exclusion of evidence, we grant a trial court broad discretion to admit or exclude evidence and will disturb its ruling only for abuse of discretion."). Both rule 59(a) and rule 60(b) allow a court to open and amend or alter a judgment based on, among other things, "newly discovered evidence," which by reasonable "due diligence could not have been discovered" or produced prior to or at the hearing or trial that resulted in the judgment. Utah R. Civ. P. 60(b); Utah R. Civ. P. 59(a)(4). Under rule 59(a)(4) a moving party must establish: (1) the existence of newly discovered evidence which is material

and competent; (2) that "by due diligence the evidence could not have been discovered and produced" before judgment was entered; and (3) that the evidence is not "merely cumulative or incidental," but is substantial enough that there is a reasonable likelihood of a different result. *Barson v. E.R. Squibb & Sons, Inc.*, 682 P.2d 832, 841 (Utah 1984).

¶ 51 Here, the district court found that one exercising reasonable due diligence would have discovered the evidence contained in the city employee affidavits prior to or at the summary judgment hearing and therefore the evidence was untimely and inadmissible. Cabaness argues that he did not present the affidavits earlier because he was unaware of Defendants' argument that Bountiful Power did not intend the Employee Manual to create a contract between the City and its employees or, in other words, that he was unfairly surprised by the Defendants' argument. This argument is unavailing. Defendants' answer to Cabaness' original pleading denied that the Employee Manual created an implied contract and Cabaness was under the obligation to demonstrate that each element of implied contract was met, including intent of the parties. We therefore hold that the district court did not abuse its discretion when it denied Cabaness' rule 59(a) and 60(b) motions. Accordingly, we do not consider the evidence contained in those affidavits.

¶ 52 We now turn to whether the district court erred in determining as a matter of law, that the Employee Manual did not create an implied contract between the parties.

### B. The District Court Erred in Finding That There Was Not an Implied Contract as a Matter of Law

¶ 53 Bountiful Power argues that the district court correctly determined as a matter of law that the plain language of the Employee Manual did not create an implied contract. We disagree.

¶ 54 Bountiful Power is a division of the City of Bountiful, and as such, its employees are public employees. Ordinarily,

"employment of public employees is 'governed by statute, not contract.'" *Canfield v. Layton City*, 2005 UT 60, ¶ 16, 122 P.3d 622 (quoting *Buckner v. Kennard*, 2004 UT 78, ¶ 32, 99 P.3d 842). We have recognized, however, "that circumstances may exist where 'the government voluntarily undertakes an additional duty' beyond its normal obligation to the employee, 'in which case an implied contract arises.'" *Id.* (quoting *Buckner*, 2004 UT 78, ¶ 32, 99 P.3d 842). Although Cabaness was a public employee, he argues that Bountiful Power voluntarily undertook additional duties in developing and distributing the Employee Manual thereby creating an implied-in-fact employment contract. We agree.

¶ 55 An implied contract may arise from a variety of sources including personnel policies or provisions of an employment manual. *See Canfield*, 2005 UT 60, ¶ 17, 122 P.3d 622 ("[A]n implied contract may 'arise from a variety of sources, including ... announced personnel policies ....'" (quoting *Berube v. Fashion Centre, Ltd.*, 771 P.2d 1033, 1044 (Utah 1989))); *Johnson v. Morton Thiokol, Inc.*, 818 P.2d 997, 1000 (Utah 1991)(an "employee manual can operate as implied-in-fact contract terms"); *Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 54 (Utah 1991)("[E]mployment manual provisions may constitute implied-in-fact terms of the employment arrangement...."); *Caldwell v. Ford, Bacon & Davis Utah, Inc.*, 777 P.2d 483, 485 (Utah 1989) ("[A]n employer's internally adopted policies and procedures ... can, in effect, become part of the contractual relationship between the employer and the employee."). In *Canfield*, we suggested in dicta that an employee manual may create an implied contract because "employees may reasonably rely on the document's provisions and may expect the employer to conform to the procedures it outlines." 2005 UT 60, ¶ 17, 122 P.3d 622 (internal quotation marks omitted). "[I]f an employee manual is to be considered part of an employment contract, the terms should be considered terms of a unilateral contract,"[8] and therefore "must

---

8. "Under a unilateral contract analysis, an employer's promise of employment under certain

terms and for an indefinite period constitutes both the terms of the employment contract and

meet the requirements for an offer of a unilateral contract." *Morton Thiokol,* 818 P.2d at 1001–02. Specifically, "[t]here must be a manifestation of the employer's intent that is communicated to the employee and sufficiently definite to operate as a contract provision." *Id.* at 1002 (internal citations omitted).

¶ 56 Because "[t]he existence of [an implied contract] is [normally] a question of fact which turns on the objective manifestations of the parties' intent," it is "primarily a jury question." *Morton Thiokol,* 818 P.2d at 1001 (internal citations omitted). However, " 'the court retains the power to decide whether, as a matter of law, a reasonable jury could find that an implied contract exists.' " *Ryan v. Dan's Food Stores, Inc.,* 972 P.2d 395, 401 (Utah 1998) (quoting *Sanderson v. First Sec. Leasing Co.,* 844 P.2d 303, 306 (Utah 1992)). Similarly, if the evidence of intent relied on by the parties does not present any triable issues of fact, the court may also determine the existence or nonexistence of an implied contract as a matter of law.

¶ 57 Relevant evidence of the intent of the parties usually "includes the language of the manual itself, the employer's course of conduct, and pertinent oral representations." *Brehany,* 812 P.2d at 56. In this case, however, Bountiful Power relies solely on the plain language of the Employee Manual without providing any other evidence of the nonexistence of an implied contract. Similarly, Cabaness also relies on the plain language of the Employee Manual as evidence of the existence of an implied contract and testified that he expected that Bountiful Power would comply with the terms of the Manual. Given the evidence provided by the parties, the district court determined, and we agree, that there were no triable issues of fact relevant to the existence of an implied contract and the issue therefore could be resolved as a matter of law. We accordingly interpret the plain language of the Employee Manual to determine whether it provides a manifestation of Bountiful Power's intent with terms that are sufficiently definite to operate as contract provisions.

¶ 58 Bountiful Power argues that the disclaimer in the Employee Manual precludes a finding that it intended to create an implied contract between itself and its employees. The disclaimer contained in Section 101 of the Employee Manual entitled "Purpose of this Manual" states that "No contract exists between Bountiful City and its employees *with respect to* salary, salary ranges, movement within salary ranges, or employee benefits." (Emphasis added). In *Morton Thiokol,* we agreed with other jurisdictions and held, "a clear and conspicuous disclaimer, as a matter of law, prevents employee manuals or other like material from being considered as implied-in-fact contract terms." ·818 P.2d at 1003. In that case, we held that "the manual ... at issue contain[ed] clear and conspicuous language disclaiming any contractual liability." *Id.* Specifically, the disclaimer categorically stated that the manual did "not create a binding contract or any other obligation or liability on the company." *Id.* Unlike the disclaimer in *Morton Thiokol,* the disclaimer in this case does not contain broad and conspicuous language disclaiming any and all contractual liability. To the contrary, it only disclaims contractual liability "with respect to" a few specifically identified items. Indeed, the plain meaning of the disclaimer in this case is that Bountiful Power intended to create a contract with its employees with respect to the items in the Employee Manual that are not specifically listed in the disclaimer.

¶ 59 Additional provisions in the Employee Manual also manifest Bountiful Power's intent to voluntarily undertake additional duties beyond its normal obligations to its employees. Although some portions of the Employee Manual express only policies, procedures, and expectations of Bountiful Power, others·rise to the level of promises on the part of Bountiful Power on which its employees should reasonably be able to rely. For

the employer's consideration for the employment contract. The employee's performance of service pursuant to the employer's offer constitutes both the employee's acceptance of the offer and the employee's consideration for the contract." · *Johnson v. Morton Thiokol,* 818 P.2d 997, 1001–02 (Utah 1991).

instance, section 406 of the Employee Manual, entitled "Work Environment," states that "City policy *will not tolerate* verbal or physical conduct by any employee which harasses, disrupts, or interferes with another's work performance or which creates an intimidating, offensive, or hostile work environment...." (Emphasis added). Additionally, section 408, entitled "Work Place Violence," mandates that "[o]ral or written threats, physical assault, harassment, intentional damage, and every other act or threat of violence is *strictly prohibited.*" (Emphasis added). Finally, Section 409, entitled "Sexual and Other Harassment," provides as follows:

> Any behavior or conduct of a harassing or discriminating nature ... which is pervasive, unwelcome, demeaning, ridiculing, derisive or coercive, or results in a hostile, abusive or intimidating work environment, constitutes harassment and *shall not be tolerated by the City.*
>
> . . . .
>
> No City official or employee shall harass, coerce, intimidate, threaten or discipline employees who exercise *their rights* under this procedure in good faith. Any such form of reprisal will render the official or employee subject to disciplinary actions.

(Emphasis added).

■■■ ¶ 60 Contrary to Bountiful Power's argument, these provisions in conjunction with the clear language of the limited disclaimer evince Bountiful Power's intent to voluntarily undertake additional duties to protect its employees from misconduct by supervisors or other employees. We therefore hold as a matter of law that the relevant

provisions of the Employee Manual create an implied contract between Bountiful Power and Cabaness.[9]

¶ 61 Having determined that the Employee Manual creates an implied contract between Cabaness and Bountiful Power, we also hold as a matter of law that an implied covenant of good faith and fair dealing was inherent in that contract. *See Brehany,* 812 P.2d at 55 ("[E]very contract is subject to an implied covenant of good faith....").

¶ 62 We now address whether the district court erred in holding in the alternative that Cabaness' implied contract claim was barred by Utah's Governmental Immunity Act.

### C. Governmental Immunity Does Not Prohibit Cabaness' Breach of Contract Claim

■■■ ¶ 63 The district court alternatively held that even assuming the Employee Manual created an implied contract between Cabaness and Bountiful Power, the claim was still barred under Utah's Governmental Immunity Act (the "GIA"). *See* Utah Code §§ 63-30-1 to -38 (1997).[10] Under section 63-30-3, "governmental entities are immune from suit for any injury which results from the exercise of a governmental function...." In order to determine whether a governmental entity retains immunity from suit under the GIA we address three questions: (1) does the activity at issue constitute a "governmental function" under Utah Code section 63-30-3 of the GIA? (2) if the activity is a governmental function, has another section of the GIA waived governmental immunity? and (3) if governmental immunity has been waived, does the GIA contain an exception

---

**9.** It is proper for us to make this determination as a matter of law because the claim for breach of an implied employment contract was subject to cross motions for summary judgment and all parties stipulated below that there were no disputed issues of material fact relating to this issue. It is therefore appropriate to decide the issue based on the evidence of record.

Furthermore, we disagree that our decision today will "wreak havoc on employers and expose them to unforeseen liability" as Bountiful Power argues, nor do we believe it will discourage employers from providing employees with needed employment manuals discussing relevant standards of conduct. If anything, our decision

today may cause employers wishing to avoid contractual liability to draft their employee manuals with clear and conspicuous disclaimer language.

**10.** The GIA has been amended and renumbered various times since the activity at issue in this case. In revising the Act, however, the Legislature indicated its intent that the previous version govern allegations of injury that occurred before July 1, 2004. *See Canfield v. Layton City,* 2005 UT 60, ¶ 7 n. 2, 122 P.3d 622. Therefore, we cite to the previous version in effect at the time the activity at issue in this case occurred.

that restores governmental immunity? *Led-fors v. Emery County Sch. Dist.*, 849 P.2d 1162, 1164 (Utah 1993). Here, the parties do not dispute that the activity at issue is a governmental function. Instead, Cabaness argues that Utah Code section 63–30–5 of the GIA waives governmental immunity and that the exceptions in section 63–30–10 do not apply and accordingly do not restore immunity. We therefore focus on the last two prongs of the immunity analysis beginning with the question of whether governmental immunity was waived under section 63–30–5.

¶ 64 Under section 63–30–5 of the GIA, governmental entities waive immunity "as to any contractual obligations." Utah Code Ann. § 63–30–5(1). As discussed above, the Employee Manual created an implied contract between Bountiful Power and Cabaness. Accordingly, under the plain language of section 63–30–5, governmental immunity is waived with respect to any contractual obligations Bountiful Power owes to Cabaness under the Employee Manual. Next we determine whether any exceptions under the GIA restore immunity to Bountiful Power.

¶ 65 Section 63–30–10 of the GIA initially waives "[i]mmunity from suit of all governmental entities ... for injury proximately caused by a negligent act or omission of an employee committed within the scope of employment...." *Id.* § 63–30–10. However, subsection 63–30–10(2) restores governmental immunity "if the injury arises out of, in connection with, or results from ... infliction of emotional anguish." *Id.* § 63–30–10(2). Bountiful Power argues that the broad language of subsection (2) bars Cabaness' contract claim because his injury arises out of the infliction of emotional anguish. Bountiful Power's argument assumes that the exception contained in subsection 63–30–10(2) applies not only to the initial waiver of immunity in section 63–30–10, but also to the waiver of immunity for contractual obligations in section 63–30–5. We reject such an assumption and hold that the waiver of immunity in section 63–30–5 is independent of the exceptions contained in section 63–30–10. Specifically, the statutory language of the GIA and relevant case law do not support a finding

that the exceptions in section 63–30–10 apply to the independent waiver of governmental immunity for contractual obligations in section 63–30–5.

¶ 66 "When examining a statute, we first look to its plain language." *State v. Laycock*, 2009 UT 53, ¶ 19, 214 P.3d 104. "We read the plain language of a statute as a whole and interpret its provisions in harmony with other statutes in the same chapter and related chapters." *Id.* (internal quotation marks and alteration omitted). In relevant part, section 63–30–10 states that governmental immunity is waived "for injury proximately caused by a negligent act or omission of an employee committed within the scope of employment except if the injury arises out of, in connection with, or results from ... infliction of mental anguish." Utah Code Ann. § 63–30–10(2). On their face, the exceptions to waiver listed in section 63–30–10 do not apply to contract claims brought under section 63–30–5. Instead, under the plain language of the statute, the exceptions apply only to the waiver of immunity for negligence actions brought under section 63–30–10.

¶ 67 We acknowledge that under our prior case law, the exceptions to waiver in section 63–30–10 have been applied to other independent waivers of governmental immunity. In *Keegan v. State*, we noted that the exceptions in section 63–30–10 have been applied to the waivers of immunity in both sections 63–30–8 and 63–30–9. 896 P.2d 618, 621 (Utah 1995). In that case, we held that an exception in section 63–30–10 barred plaintiff's complaint brought under section 63–30–8. *Id.* at 623. And relying on *Keegan*, we held in *Taylor v. Ogden City School District* that the exceptions in 63–30–10 apply to the waiver of immunity in section 63–30–9. 902 P.2d 1234, 1234 (Utah 1995) (per curiam). After the injuries occurred in both *Keegan* and *Taylor*, but before the cases were decided, the legislature amended sections 63–30–8 and 63–30–9 and qualified the waiver of governmental immunity by stating that immunity was waived "[u]nless the injury arises out of one or more of the exceptions to waiver set forth in Section 63–30–10." *Keegan*, 896 P.2d at 620–21 (quoting Utah Code Ann. § 63–30–8 (1993)); *Taylor v. Ogden City Sch. Dist.*, 927

P.2d at 159, 160, n. 2 (Utah 1996); *see also* Utah Code Ann. §§ 63–30–8, 63–30–9 (1997). Thus, although it is now clear that the exceptions in section 63–30–10 apply to sections 63–30–8 and 63–30–9, the *Keegan* and *Taylor* cases may appear somewhat troubling because both applied the exceptions in section 63–30–10 to independent waivers of governmental immunity before the legislative amendments were effective. However, after reviewing the *Keegan* and *Taylor* cases and their predecessors, it is clear that the exceptions in section 63–30–10 were applied to other independent waivers of immunity because the initial causes of action at issue in these cases sounded in negligence.[11] *See Keegan*, 896 P.2d at 622 (reviewing prior cases holding that the exceptions in 63–30–10 applied to other independent waivers of immunity).

¶ 68 Unlike *Keegan* and other prior cases, Cabaness' claim against Bountiful City does not sound in negligence. Rather, it sounds squarely in contract. While we will reject claims that reflect "attempts to evade the[ ] statutory categories [of the GIA] by recharacterizing the supposed cause of the injury," *Ledfors*, 849 P.2d at 1166, that is not the case here because Cabaness has a legitimate contractual claim against Bountiful Power. As discussed above, the Employee Manual created an implied contract between Bountiful Power and Cabaness with specific enforceable provisions. And although some of Caba-

ness' injuries may have arisen from the infliction of mental anguish, that is exactly the type of injury that the terms of the contract appear designed to prevent.

¶ 69 Further, it is significant that when the legislature amended sections 63–30–8 and 63–30–9 to incorporate the exceptions listed in section 63–30–10, it did not amend the waiver of immunity in section 63–30–5. Instead, the plain language of section 63–30–5 indicates that it was intended to apply to "*any* contractual obligation[s]" of a governmental entity, without qualification. Utah Code Ann. § 63–30–5 (emphasis added).

■■■ ¶ 70 In summary, we hold that under the plain language of the GIA, the exception to waiver in section 63–30–10(2) does not apply to actions that are brought under section 63–30–5 and that legitimately sound in contract. Accordingly, governmental immunity in this case is waived under section 63–30–5 and no other provisions of the GIA restore it. Therefore, the district court erred in holding that Cabaness' implied contract claim was barred by the GIA.[12] Next we address whether consequential damages apply to Cabaness' implied contract claim.

### D. Cabaness May Recover Damages for Mental Distress Related to His Contract Claim

■■■ ¶ 71 Bountiful Power argues that damages for emotional or mental distress are

11. Bountiful Power suggests that the court of appeals' analysis in *Butler, Crockett and Walsh Development Corporation v. Salt Lake County* demonstrates that the exceptions to section 63–30–10 apply to contract actions. 2005 UT App 402, 2005 WL 2303808, 2005 Utah App. LEXIS 394 (Utah Ct.App.2005) (per curiam). In *Butler*, plaintiffs brought a contract-based declaratory action against the County for denying their application for a conditional use permit. *Id.* at *1, 2005 Utah App. Lexis 394 at *1–3. The court of appeals held that the complaint sought affirmative relief and was not a declaration of rights under a contract and then held that because the injury asserted arose out of conduct described by one of the exceptions in section 63–30–10, plaintiff's action was barred by governmental immunity. *Id.* Although we agree with the outcome, we find that the court of appeals erred in that case by relying on any of the exceptions in section 63–30–10 because the claim did not assert any claim of negligence, nor was it brought under sections 63–30–8 or 63–30–9. Instead, the court of ap-

peals should have found that the County was immune from suit under section 63–30–3 because the alleged injury resulted "from the exercise of a governmental function," and no other provisions of the GIA waived that immunity.

Bountiful Power also argues that our analysis in *Ledfors v. Emery County School District*, 849 P.2d 1162 (Utah 1993), compels a finding that the exceptions in section 63–30–10 apply to Cabaness' contract claim. We disagree. In *Ledfors*, both parties agreed that governmental immunity was initially waived under section 63–30–10. *Id.* at 1165. Thus, there was no question that the exceptions to immunity contained in that section applied and might bar plaintiff's claim.

12. We note that while our decision today is based on a former version of the GIA, the analysis with respect to governmental immunity would have been very similar and the outcome would have been the same under the newly amended and renumbered GIA. *See* Utah Code Ann. § 63G–7–301(1) to (5) (2008).

not recoverable on Cabaness' contract claim. Given the unusual nature of the contract at issue here, we hold that compensation for emotional distress and mental suffering may be available where emotional distress and mental suffering naturally flow from a breach of the terms of the contract between Bountiful Power and were within the contemplation of the contracting parties. Because questions of fact remain regarding whether these damages were within the contemplation of the parties at the time the contract was formed, the district court erred in granting defendants' summary judgment on this issue.

¶ 72 A non-breaching party may recover both "general damages, which flow naturally from the breach, and consequential damages, which, while not an invariable result of breach, were reasonably foreseeable by the parties at the time the contract was entered into." *Mahmood v. Ross*, 1999 UT 104, ¶ 19, 990 P.2d 933 (internal quotation marks omitted). Generally, "there is no recovery of damages for mental anguish stemming from a breach of contract." *Ams. Disabled for Accessible Pub. Transp. v. SkyWest Airlines, Inc.*, 762 F.Supp. 320, 326 (D.Utah 1991). But we have recognized an exception to this general rule in unusual circumstances. In the context of a breach of a first-party insurance contract, we held that consequential "damages for mental anguish might be provable" because "insurance frequently is purchased not only to provide funds in case of loss, but to provide peace of mind for the insured or his beneficiaries." *Beck v. Farmers Ins. Exch.*, 701 P.2d 795, 802 (Utah 1985). Although our analysis in *Beck* was based on "the unique nature and purpose of an insurance contract" and has not yet been applied to other types of breach of contract cases, we find the analysis instructive in the case before us. *Id.*

¶ 73 In *Beck*, we stated that the foreseeability of contractual damages related to economic distress or mental anguish "will always hinge upon the nature and language of the contract and the reasonable expectations of the parties." *Id.* While this statement was made within the context of an insurance contract, we believe it applies to all contract actions. Other jurisdictions have similarly recognized that contractual damages related to emotional distress may be an appropriate remedy depending on the foreseeability of such damages and the specific nature of the contract at issue. *See, e.g., Sullivan v. O'Connor*, 363 Mass. 579, 296 N.E.2d 183, 188–89 (1973) ("[T]here is no general rule barring such items of [emotional] damage[s] in actions for breach of contract. It is all a question of the subject matter and background of the contract...."); *Stewart v. Rudner*, 349 Mich. 459, 84 N.W.2d 816, 824 (1957) (holding that economic distress is a recoverable contract damage when the contract concerns "matters of mental concern or solicitude" and such damages were within "the contemplation of the parties"); *Lamm v. Shingleton*, 231 N.C. 10, 55 S.E.2d 810, 813 (1949) ("Where the contract is personal in nature and the contractual duty or obligation is so coupled with matters of mental concern or solicitude, or with the sensibilities of the party to whom the duty is owed, that a breach of that duty will necessarily or reasonably result in mental anguish or suffering, and it should be known to the parties from the nature of the contract that such suffering will result from its breach, compensatory damages therefor may be recovered."); *see also*, Restatement (Second) of Contracts § 353 (1981) (stating that a non-breaching party may recover emotional damages whenever "the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result").

¶ 74 In a recent decision discussing this issue, the United States Court of Appeals for the Eleventh Circuit made the following statement:

> Although the general rule is that emotional damages for breach of contract will not lie, this rule is simply a shorthand way of saying that emotional distress is usually not a foreseeable consequence of breach. But when the nature of the contract is such that emotional distress is foreseeable, emotional damages will lie.

*Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1200 (11th Cir.2007) (internal citations omitted). We agree and recognize that emotional distress is typically not recoverable in an action for breach of contract be-

cause such damages are rarely a foreseeable result of breach. To be sure, "in the ordinary commercial contract, damages are not recoverable for disappointment, even amounting to alleged anguish, because of breach." *Stewart*, 84 N.W.2d at 823. This is so because, although

> [i]n such cases breach of contract may cause worry and anxiety varying in degree and kind from contract to contract, depending upon the urgencies thereof, the state of mind of the contracting parties, and other elements, but it has long been settled that recovery therefor was not contemplated by the parties as the "natural and probable" result of the breach.

*Id.* Indeed,

> [s]ome type of mental anguish, anxiety, or distress is apt to result from the breach of any contract which causes pecuniary loss. Yet damages therefor are deemed to be too remote to have been in the contemplation of the parties at the time the contract was entered into to be considered as an element of compensatory damages.

*Lamm*, 55 S.E.2d at 813.

¶ 75 But we also agree that in rare cases the non-breaching party to a contract may recover damages for emotional distress. Accordingly, given our discussion above, we hold that a non-breaching party may recover general and/or consequential damages related to emotional distress or mental anguish arising from a breach of contract when such damages were both a foreseeable result of the breach of contract and *explicitly* within the contemplation of the parties at the time the contract was entered into. As we stated in *Beck*, the applicability of such damages "will always hinge upon the nature and language of the contract and the reasonable expectations of the parties." 701 P.2d at 802.

¶ 76 In this case, Bountiful Power contracted with Cabaness and agreed, among other things, that it would "not tolerate verbal or physical conduct by any employee which harasses, disrupts, or interferes with another's work performance or which creates an intimidating, offensive, or hostile work environment." Because this contractual provision of the Employee Manual is specifically directed toward matters of mental concern and solicitude, any breach thereof may result in emotional distress and mental anguish. Further, the unusual nature of the contractual obligations and the specific language of the contractual provisions give rise to the possibility that emotional damages were within the contemplation of the parties at the time the contract was entered. Therefore, the district court erred when it granted summary judgment in favor of Bountiful Power on this issue. We therefore remand to the trial court the questions of whether emotional damages were within the contemplation of the parties at the time of the contract was formed and whether such damages are therefore recoverable.

## IV. CABANESS' WRONGFUL CONSTRUCTIVE TERMINATION CLAIM FAILS AS A MATTER OF LAW

¶ 77 The district court found that Cabaness' wrongful constructive termination claim failed because the claim sounded in tort and Cabaness failed to allege any violations of a clear and substantial public policy. We agree.

¶ 78 "Under Utah law, all employment relationships entered into for an indefinite period of time are presumed to be at-will," meaning that "either the employer or the employee may terminate the employment for any reason (or no reason) except where prohibited by law." *Touchard v. La-Z-Boy Inc.*, 2006 UT 71, ¶ 3, 148 P.3d 945 (internal quotation marks omitted). "[A]n employer's decision to terminate an employee is presumed to be valid." *Id.* In order to overcome this presumption, a discharged employee must show that:

> (1) there is an implied or express agreement that the employment may be terminated only for cause or upon satisfaction of [some] agreed-upon condition; (2) a statute or regulation restricts the right of an employer to terminate an employee under certain conditions; or (3) the termination of employment constitutes a violation of a clear and substantial public policy.

*Id.* (alteration in original) (internal quotation marks omitted). In this case, Cabaness' em-

ployment was for an indefinite term and was therefore presumed to be at-will. Therefore, in order to succeed on any wrongful termination claim, Cabaness must demonstrate that one of the three exceptions to the at-will doctrine apply.

¶ 79 Neither Cabaness nor Bountiful City has argued that the second or statutory exception to the at-will doctrine applies to the facts of this case, and we therefore do not address it. Instead, Cabaness argues that his wrongful constructive termination claim falls under the first of the three exceptions to the at-will rule described above, i.e., that his constructive discharge was in violation of an implied or express employment agreement. As we have already determined, certain provisions of the Employee Manual created an implied contract between Cabaness and Bountiful Power. However, those provisions do not create any obligations on the part of Bountiful Power with respect to the process of terminating employees. Further, none of Cabaness' allegations in the complaint, nor any of his arguments before us, cite to any relevant portions of the Employee Manual regarding Bountiful Power's contractual obligations with respect to its decisions regarding the termination of employees. Instead, the thrust of Cabaness' argument is that Bountiful Power's failure to comply with its contractual obligation to provide a non-hostile working environment resulted in his wrongful constructive termination. While this may be an appropriate argument for consequential damages resulting from a breach of contract under Cabaness' implied contract claim, it does not satisfy the first exception to the at-will doctrine.[13] We therefore look to whether Cabaness' wrongful constructive termination claim succeeds under the third exception, the public policy exception to the at-will doctrine.

¶ 80 In order to succeed under the public policy exception to the at-will doctrine, an employee must demonstrate that he or she was discharged "in violation of clear and substantial public policy." *Id.* ¶ 4 (internal quotation marks omitted). Cabaness admits that he has not attempted to allege or plead any clear and substantial public policy, therefore he has failed to meet his burden under the third exception to the at-will doctrine.

¶ 81 Because Cabaness' wrongful constructive termination claim does not fall under one of the three exceptions to the at-will doctrine, we affirm the district court's holding that Cabaness' wrongful constructive termination claim fails as a matter of law.

## CONCLUSION

¶ 82 We hold that the relevant provisions of the Employee Manual, as discussed above, created an implied contract between Cabaness and Bountiful Power. Similarly, we hold that Cabaness' implied contract claim is not barred by Utah's Governmental Immunity Act. Additionally, assuming Cabaness can prove a breach of the implied contract, we hold that he may seek damages for emotional distress and mental anguish. We further hold that the district court erred in dismissing Cabaness' intentional infliction of emotional distress claims because Cabaness offered sufficient evidence to create a jury question regarding whether Thomas' conduct was sufficiently intolerable and outrageous. But we affirm the district court's decision to dismiss Cabaness' intentional infliction of emotional distress claim against Michaelis. And we affirm the district court's determination that Cabaness' wrongful constructive termination claim fails as a matter of law. We therefore remand the case to the district court for proceedings consistent with this opinion.

¶ 83 Chief Justice DURHAM, Associate Chief Justice DURRANT, and Justice NEHRING concur in Justice PARRISH'S opinion.

---

**13.** We doubt whether a wrongful "constructive" termination will ever satisfy the first exception to the at-will doctrine. The first exception requires that an employee point to specific terms of an employment contract that demonstrates an employer did not follow proper agreed upon procedures prior to terminating him or her. But a "constructive" termination, by its very nature, implies that the employee left before an employer had any opportunity to apply the agreed upon procedures.

WILKINS, Justice, dissenting:

¶ 84 I would affirm the judgment of the district court in all regards. I would not extend *Beck* to non-insurance contract claims, nor would I deem the provisions relied upon by the majority in the employee manual as sufficient to form a contract between the parties.